UNITED STATES of America

v.

Roland W. BROWN, Appellant.

No. 72–1066.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 22, 1973.

Decided Dec. 28, 1973.

As Amended Jan. 10, 1974.

* Mr. Gayer and Mr. Ulrich also held clearances for access to secret material.

Walter R. Choroszej, Washington, D. C. (appointed by this court) for appellant.

John C. Lenahan, Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty., John A. Terry, Theodore Wieseman, and John F. Evans, Asst. U. S. Attys., were on the brief, for appellee.

Before BAZELON, Chief Judge, and WRIGHT and MacKINNON, Circuit Judges.

MacKINNON, Circuit Judge:

Appellant was charged in a four-count indictment on September 9, 1969, with first degree murder and with carrying a dangerous weapon. On October 6 and 9, 1969, the trial court heard and denied appellant's motion to dismiss the indictment for lack of a speedy trial. Thereafter, on October 13, a jury trial commenced, and on October 24 appellant was found guilty of (1) second-degree murder and (2) carrying a dangerous weapon (D.C.Code § 22–3204). On November 12 the trial court granted appellant's motion for a mental examination, and on November 14 it ordered appellant's commitment to Saint Elizabeths Hospital.

On May 25, 1971, the court ordered a separate trial to determine appellant's mental responsibility for the crimes committed. Following a jury trial on September 14–22, appellant was found to be mentally responsible for both offenses. On December 14, 1971, the court heard and denied appellant's motion for judgment of acquittal notwithstanding the verdict or, in the alternative, for a new trial; and on the same date appellant was sentenced to (1) ten years to life imprisonment on the murder count and (2) two to ten years' imprisonment for carrying a dangerous weapon, the sentences to run concurrently. This appeal followed.

Under the Government's theory of the case, the victim, Parks, was a link in appellant's drug distribution network, peddling his merchandise on consignment from appellant. Upon falling into arrears in turning over to the appellant the money received from the drug sales, Parks was "disciplined" in traditional gangland fashion.

The case for the prosecution consisted principally of the testimony of another of appellant Brown's "outlets," one Dyson, who placed Brown at the scene of the crime and related a number of highly incriminating surrounding circumstances.[1] Other witnesses corrob-

---

1. Dyson (who admitted he had recently injected himself with narcotics) testified that he heard appellant arguing with the victim, then heard a shot, saw Parks' body fall down the stairs and subsequently saw appellant emerge at the top of the stairs with

orated the basic pattern of Brown's narcotics operations and "disciplinary" methods as well as chronicling a variety of threats uttered by appellant against Parks and others.

The defense sought to impeach Dyson's credibility and also placed in issue the identity of the murderer by raising an alibi defense. The government apparently was successful in rebutting the alibi since the jury found Brown guilty of second-degree murder.[2]

Appellant raises a wide array of issues. One issue, which we discuss at some length, is an evidentiary issue involving the improper admission of certain highly prejudicial hearsay testimony. Since we reverse on this narrow ground alone, we do not reach most of the issues argued by appellant since these alleged errors would be obviated by a new trial. However, since the speedy trial claim and the alleged defects in the separate trial on mental responsibility would recur in a new trial, we deal with them only very briefly here since we find these claims to be without merit. There simply was no substantial prejudicial delay attributable to the government in this case, and we agree with the trial judge's ruling in this regard. Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).[3] As to the separate trial on mental responsibility, there is no question that this was conducted without prejudicial error and that the verdict is amply supported by the evidence.[4]

what "looked like a .45 . . . automatic." Tr. 175–76; Brief for Appellee at 6–7.

2. Thereafter appellant was determined mentally responsible for his crimes in a subsequent trial on this issue. Appellant raises certain objections as to this insanity trial with which we briefly deal, n. 4 *infra*.

3. Appellant was arrested on March 25, 1969, and his trial began on October 13, 1969, 6½ months later. Until July 31, the case proceeded through the routine initial stages of a prosecution, including a preliminary hearing on May 12, the filing of an original indictment on May 19, and arraignment on May 29. On July 31 appellant's counsel and the prosecutor then assigned to the case agreed to a trial date of September 15 (Tr. 12–13). In the interim, however, the original prosecutor resigned from the United States Attorney's Office, and this case was transferred to a new prosecutor who, after appellant was reindicted on September 9 (due to an error in the first indictment), requested the court on September 11 to continue the trial to September 29 to give him an opportunity to prepare (October 9, 1969, Tr. 13, 17, 25). On September 16 appellant was arraigned on the new indictment, and on September 29 the court sua sponte continued the trial to October 13 because of a potential conflict with a special calendar call the following week during which time the District Court in executive session had ordered that no trials would be held.

It is obvious that these facts do not raise a speedy trial issue. There were no long stretches of docket inactivity and the most delay that could be attributed to the Government was only 3 or 4 weeks due to unusual circumstances. Moreover we perceive no substantial prejudice to the appellant caused by the lapse of time from arrest to trial.

4. Appellant contends that the evidence was insufficient to establish that he was in fact not suffering from any mental disease or defect at the time of the trial. However, three psychiatrists, testifying as Government experts, unanimously agreed he was mentally responsible. Of the defense experts, one testified he was a sexual deviate but did not relate this to the crime. One testified that in 1970 he was psychotic but did not express any opinion as to the time of the crime, and only one said he was "schizoid" at that time. On this evidence a jury could rightly decide he was responsible.

The instruction on insanity was also questioned because the judge stated that appellant would be immediately committed for a mental examination, after which there would be another judicial determination as to whether he was suffering from a mental illness at that time and whether he was dangerous to himself or others. The Court added that if he was found to be suffering from a mental illness but was not dangerous to himself or others he would be released from the hospital. Tr. 803. This is an entirely accurate statement of the law at the time of the trial. Bolton v. Harris, 130 U.S.App.D.C. 1, 395 F.2d 642 (1968). There is no violation of Lyles v. United States, 103 U.S.App.D.C. 22, 254 F.2d 725 (1957), cert. denied, 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067 (1958), as modified by *Bolton*. Under these circumstances appellant's contention in this regard is without merit.

The evidentiary question upon which we focus our attention involves certain testimony elicited by the prosecution from the victim's wife. The government made a proffer that Mrs. Parks would testify to the effect that Mr. Parks had told her prior to his death that he was frightened that he would be murdered by appellant, Roland Brown. Defense counsel objected to this as hearsay, and the prosecution sought to justify it under the state of mind exception to the hearsay rule as somehow explaining the deceased's actions around the time of death.[5] The government realized that the testimony could not be considered as probative of the fact that Brown was the killer and even offered to delete the reference to Brown, leaving only the statement that Parks was afraid of being killed by someone. The trial court, however, refused to allow the deletion, being under the impression that this would have been improper.[6] The trial court also denied defense counsel's request for a limiting instruction at the time of the testimony[7] but did give the requested instruction at the close of the trial along with all the other charges.

The testimony that was finally elicited, and objected to, not only included the name of the defendant but dramatically emphasized it:

> Q: You mentioned, Mrs. Parks, that he was frightened. What was he frightened of?
>
> A: Frightened that he may be killed.
>
> Q: And who did he say he was frightened was going to kill him?
>
> A: Mr. Roland Brown.
>
> MR. HOUCK: No further questions. Tr. 451

Ultimately at the end of the trial, the judge did give an instruction on the permissible scope of the jury's consideration of the above testimony:

> You have heard testimony in the course of this trial from Mrs. Thelma Parks that her husband, the deceased, Ricardo Parks, was afraid that he was going to be killed by Roland W. Brown. You ladies and gentlemen of the jury are instructed that this testimony is to be considered by you in connection with evaluating the state of mind of Ricardo Parks and its effect, if any, on his, Ricardo Parks' subsequent conduct.
>
> You are not to consider this testimony to evaluate the state of mind or the conduct of the defendant, Roland W. Brown, nor infer nor conclude that the defendant inflicted injuries upon Ricardo Parks from which he died solely from this testimony.[8]

## I. GENERAL PRINCIPLES

■ Briefly stated, the state of mind exception to the hearsay rule allows the admission of extrajudicial statements to show the state of mind of the declarant at that time if that is at issue in the case. *See* Proposed Rules of Evidence for the United States Courts, Rule 803(3) (1973); note 55 *infra*. It also allows such statements to show a future intent of the declarant to perform an act if the occurrence of that act is at issue. Mutual Life Ins. Co. v. Hillmon, 145 U.S. 285, 12 S.Ct. 909, 36 L. Ed. 706 (1892). In showing the declarant's state of mind the statements may either consist of direct or circumstantial evidence. Thus the statement "X is no good" circumstantially indicates the declarant's state of mind toward X and,

---

5. Tr. 327–28 (Set out at length at n. 83 *infra*).

6. Tr. 333–34. *See* notes 72, 79–80, 84 *infra* & accompanying text.

7. A limiting instruction at the time of the testimony would have been preferable. *See* text accompanying notes 75–78 *infra*.

8. Tr. 1174–75. The instruction is correct in all respects except one. The word "solely" in the last line implies that the evidence can be considered as *somewhat* reflecting on Brown's guilt. This is in conflict with the first part of this paragraph in the instruction and is, as will be further explained *infra*, erroneous to the extent that it allows such inference.

where that mental state is a material issue in the case, such statement would be admissible with a limiting instruction. Technically it is not even hearsay since it is not being admitted for the truth of the matter alleged. We do not care whether X is in fact "no good" but only whether the declarant disliked him. However direct statements are also admitted. Thus the statement "I hate X" is direct evidence of the declarant's state of mind and, since it is being introduced for the truth of the matter alleged, must be within some exception to the hearsay rule in order to be admissible. Since the state of mind exception does permit just such testimony, the distinction is not very important.[9] However, where the statement is of the former type (circumstantially probative of the declarant's state of mind), it invariably involves certain extraneous factual elements. In these situations a limiting instruction is always necessary to ensure that such factual matters are to be considered solely on the issue of the declarant's mental state and not for the truth of the matters contained therein.[10]

This is, of course, the familiar rule of multiple admissibility.[11] In this context it operates in this manner: A statement which would be pure hearsay as to the truth of the matters alleged is not made inadmissible thereby if introduced solely to show the declarant's state of mind and if accompanied by a limiting instruction. This represents a basic policy judgment that the possibility of misuse of the evidence for the impermissible purpose, when minimized by a limiting instruction, is a risk worth chancing when compared to the harms that would likely result from the total exclusion of valuable relevant evidence. Yet recognition of the limited effectiveness of the special instruction has produced marked inroads on the rule of multiple admissibility where great prejudice inheres in the statement in question.[12]

These principles must be applied with due deference to another fundamental concept in the law of evidence—that of relevance. It is well established that *some* evidence, while bearing some *logical* relevance to the case, may in the discretion of the judge nevertheless be excluded where its probative value is substantially outweighed by the danger of unfair prejudice, confusion or delay.[13]

---

9. VI Wigmore on Evidence §§ 1715, 1730 (3d ed. 1940). *See also* Benwell v. Dean, 249 Cal.App.2d 345, 57 Cal.Rptr. 394, 399 (1967).

10. A limiting instruction is generally required with direct state of mind testimony as well. In cases like this involving statements of fear, clearly such statements always carry the implication that there is a justification for such fear. Just because the underlying facts providing the basis for the fear are not explicitly set forth should not be any basis for distinction. A limiting instruction is necessary to confine the jury's consideration of the statement to whatever probative value it has on the issue of the declarant's state of mind rather than to allow the jury to draw any inferences as to the truthfulness of the statement's allegations, explicit or implied.

In general, where state of mind testimony is sought to be used in an attempt to demonstrate the truth of the underlying facts rather than solely to show state of mind, the evidence must be excluded. Buckeye Powder Co. v. E. I. du Pont de Nemours Powder Co., 248 U.S. 55, 65, 39 S.Ct. 38, 63 L.Ed. 123 (1918); Herman Schwabe, Inc. v. United Shoe Machinery Corp., 297 F.2d 906, 914 (2d Cir. 1962); Superior Engraving Co. v. NLRB, 183 F.2d 783, 792 (7th Cir. 1950).

11. I Wigmore on Evidence § 13 (3d ed. 1940); *see, e. g.,* Dunham v. Pannell, 263 F.2d 725, 729–730 (5th Cir. 1959); Sprinkle v. Davis, 111 F.2d 925, 931 (4th Cir. 1940).

12. *See* text accompanying notes 18–21 *infra.*

13. *See generally* McCormick on Evidence § 185 (2d ed. 1972) ("[A] leeway of discretion is generally recognized." *Id.* at 440); I Wigmore on Evidence § 29a (3d ed. 1940); Proposed Rules of Evidence for the United States Courts, Rule 403 (1973):

Rule 403.

EXCLUSION OF RELEVANT EVIDENCE ON GROUNDS OF PREJUDICE, CONFUSION, OR WASTE OF TIME

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

H.R.5463, 93d Cong., 1st Sess., Committee Print (June 28, 1973).

This concept of "relative relevance," a rule of extrinsic policy,[14] allows the court to balance the need for such evidence against its probable dangers.

## II. RELEVANCE BALANCING OF STATE OF MIND TESTIMONY

### A. Prejudice

■ In order to examine this balancing process in this context, we must begin by asking what exactly is the "prejudice" with which we are concerned here. Since such statements invariably contain two components—the circumstantial facts themselves and the inference to be drawn from such facts as to the declarant's state of mind—the prejudice lies in the danger of jury *misuse* of the evidence. Despite a limiting instruction to the effect that the evidence is to be considered solely on the issue of the declarant's state of mind (the proper purpose), there is the ever-present danger that the jury will be unwilling or unable to so confine itself. In cases like this, then, involving statements probative of the declarant's state of mind, the rule of multiple admissibility must be read in conjunction with the balancing rule of relevance. That is, where the

limiting instruction is likely to be ineffective in its purpose, the possible ensuing prejudice must be weighed against the statement's probative value.[15] While the degree of prejudice depends on a number of factors,[16] perhaps the single most important consideration may be whether the statement, if used by the jury for its improper purpose, is virtually dispositive of the case and extremely damaging to the position taken by the opponent of the admission of the evidence (the defendant)[17].

It should be emphasized that in the great majority of cases the limiting instruction is probably sufficient to so minimize the dangers of jury misuse as to prevent most serious prejudice. Long ago it was decided that such state of mind evidence should generally be admissible for a limited purpose.[18] In civil cases, such evidence is perhaps somewhat more freely admitted than in criminal actions since the prejudice often seems less pronounced. Yet even in civil cases, the limited utility of the special instruction with regard to such statements has been recognized, *E. g.*, Adkins v. Brett, 184 Cal. 252, 193 P. 251, 254 (1920).[19] In criminal cases in gener-

---

14. I Wigmore on Evidence § 12 (3d ed. 1940).

15. "The rule [of multiple admissibility] is one of necessity and the risk of misuse should not be incurred if the evidence is not directed to a disputed issue in the case." People v. Spencer, 140 Cal.App.2d 97, 294 P.2d 997, 1002 (1956).

16. *See* notes 55–68 *infra* & accompanying text.

17. This interrelation of the rules of multiple admissibility and relevance in the state of mind context is well summarized by McCormick:

Declarations such as those involved here frequently include assertions other than as to state of mind, as, for example, assertions that the defendant's acts caused the state of mind. The truth of those assertions may coincide with other issues in the case, such as whether the defendant's acts did in fact cause the state of mind. When this is so, the normal practice is to admit the declaration and direct the jury to consider it only in proof of the state of mind

and to disregard it as evidence of the other issues. Compliance with these instructions is probably beyond the jury's ability and almost certainly beyond their willingness. Where there is adequate evidence on the other issues, this probably does little harm. But in a case where the mental state is provable by other available evidence and the danger of harm from improper use by the jury of the offered declarations is substantial, the judge's discretion to exclude the declarations has been recognized.

McCormick on Evidence § 294 at 696 (2d ed. 1972). McCormick is here assuming some direct relevance to the case. Yet nevertheless is it recognized that there are times when the evidence must be excluded. Where no such relevance is demonstrated, admission is improper a fortiori.

18. *See, e. g.,* the early opinion by Judge Holmes, Elmer v. Fessenden, 151 Mass. 359, 24 N.E. 208 (1889).

19. *See also* Warner Construction Corp. v. Los Angeles, 2 Cal.3d 285, 85 Cal.Rptr. 444,

al there has been a significantly greater acknowledgment of the weaknesses of the limiting instruction.[20] And specifically in the context of state of mind testimony in criminal homicide cases like the one *sub judice*, courts have expressly recognized that the limiting instruction is inadequate where the prejudicial dangers far outweigh a tenuous relevance to the issues presented in the case and where it is simply unrealistic to believe that the refined distinctions demanded by the limiting instruction can be faithfully maintained by any jury.[21]

Quite a number of courts have confronted facts similar to those here involving hearsay statements made by the victim of a homicide which inferentially implicate the defendant.[22] Such state-

---

452, 466 P.2d 996 (1970); Coleman v. Southern Pacific Co., 141 Cal.App.2d 121, 296 P.2d 386, 394 (1956); McCormick on Evidence § 294 at 696 (2d ed. 1972).

**20.** Bruton v. United States, 391 U.S. 123, 132–133 n. 8, 88 S.Ct. 1620, 1626, 20 L.Ed. 2d 476 (1968):

Judge Hand addressed the subject several times. The limiting instruction, he said, is a "recommendation to the jury of a mental gymnastic which is beyond, not only their powers, but anybody's else," Nash v. United States, [2 Cir.] 54 F.2d 1006, 1007; "Nobody can indeed fail to doubt whether the caution is effective, or whether usually the practical result is not to let in hearsay," United States v. Gottfried, [2 Cir.] 165 F.2d·360, 367; "it is indeed very hard to believe that a jury will, or for that matter can, in practice observe the admonition," Delli Paoli v. United States, [2 Cir.] 229 F.2d 319, 321. Judge Hand referred to the instruction as a "placebo," medically defined as "a medicinal lie." Judge Jerome Frank suggested that its legal equivalent "is a kind of 'judicial lie': It undermines a moral relationship between the courts, the jurors, and the public; like any other judicial deception, it damages the decent judicial administration of justice." United States v. Grunewald, [2 Cir.] 233 F.2d 556, 574. See also 8 Wigmore, *supra*, n. 3, § 2272, at 416.

But see *id.* at 138–144, 88 S.Ct. 1620 (White, J., dissenting). While the case at hand obviously does not present a *Bruton* problem, some of the same policy considerations are present. *See also* People v. Simms, 10 Cal.App.3d 299, 89 Cal.Rptr. 1, 9 (1970); People v. Sweeney, 55 Cal.2d 27, 9 Cal.Rptr. 793, 357 P.2d 1049 (1961).

**21.** People v. Hamilton, 55 Cal.2d 881, 13 Cal.Rptr. 649, 362 P.2d 473 (1961):

It is difficult to believe that even the trained mind of a psychoanalyst could thus departmentalize itself sufficiently to obey the mandate of the limiting instruction. Certainly a lay mind could not do so.

13 Cal.Rptr. at 657, 362 P.2d at 481. *See also* Shepard v. United States, 290 U.S. 96, 54 S.Ct. 22, 78 L.Ed. 196 (1933); People v. Lew, 68 Cal.2d 774, 69 Cal.Rptr. 102, 441 P.2d 942 (1968).

**22.** Many of the cases dealing with this precise question come from California and the Western states. This opinion is not overly preoccupied with the course of California state jurisprudence, but since many of its cases are instructive on the present question, they are analyzed in detail. California has codified the rule on the state of mind exception to provide that under certain circumstances such testimony should be admitted if there is no indication that it lacks trustworthiness. People v. Spencer, 71 Cal. 2d 933, 80 Cal.Rptr. 99, 458 P.2d 43, 51, 53 (1969). The statutes provide:

Section 1200: "(a) 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated.

(b) Except as provided by law, hearsay evidence is inadmissible."

Section 1250: "(a) Subject to Section 1252, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when:

(1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or

(2) The evidence is offered to prove or explain acts or conduct of the declarant.

(b) This section does not make admissible evidence of a statement of memory or belief to prove the fact remembered or believed."

Section 1252: "Evidence of a statement is inadmissible under this article if the statement was made under circumstances such as to indicate its lack of trustworthiness."

Cal.Evid.Code §§ 1200, 1250, 1252 (West. 1966).

ments by the victims often include previous threats made by the defendant towards the victim, narrations of past incidents of violence on the part of the defendant or general verbalizations of fear of the defendant. While such statecents are admittedly of some value in presenting to the jury a complete picture of all the facts and circumstances surrounding the homicide,[23] it is generally agreed that their admissibility must be determined by a careful balancing of their probative value against their prejudicial effect.[24] Courts have recognized that such statements are fraught with inherent dangers and require the imposition of rigid limitations.[25] The principal danger is that the jury will consider the victim's statement of fear as somehow reflecting on *defendant's* state of mind rather than the victim's—*i. e.*, as a true indication of defendant's intentions, actions, or culpability.[26] Such inferences are highly improper and where there is a strong likelihood that they will be drawn by the jury the danger of injurious prejudice is particularly evident.

The quantum of prejudice, as stated above, is highest when the circumstantial facts in the statement are intimately related to the issue to be proved. In the context of homicide cases such as this, it is clear that where the improper purpose for which the jury might consider the evidence bears closely on the central question of defendant's guilt or innocence there is less likelihood that the jury will confine the statement to its proper realm. Here the functional utility of the limiting instruction becomes most doubtful. This is the lesson of the famous case Shepard v. United States, 290 U.S. 96, 54 S.Ct. 22, 78 L.Ed. 196 (1933). There the state of mind testimony which directly accused the defendant was so dispositive of his guilt[27] that the limiting instruction undoubtedly would have been entirely futile.[28] In re oft repeated words of Justice Cardozo:

It will not do to say that the jury might accept the declarations for any light that they cast upon the existence of a vital urge, and reject them to the extent that they charged the death to some one else. Discrimination so subtle is a feat beyond the compass of ordinary minds. The reverberating clang of those accusatory words would drown all weaker sounds. It is for ordinary minds, and not for psychoana-

---

23. "Generally the basis for accepting such testimony is that the behavior of both the victim and the defendant are part of the mosaic of the criminal event, and hence, insofar as their declarations bear upon either the quality of their acts or a relevant state of mind, they must be accepted as part and parcel of the critical scene." State v. Baldwin, 47 N.J. 379, 221 A.2d 199, 207 (1966).

24. People v. Purvis, 56 Cal.2d 93, 13 Cal. Rptr. 801, 362 P.2d 713, 717 (1961) ; People v. Hamilton, note 21 *supra;* People v. Sweeney, note 20 *supra*, 357 P.2d at 1058; People v. Finch, 213 Cal.App.2d 752, 29 Cal. Rptr. 420, 430 (1963) ; State v. Wright, 504 P.2d 1065, 1066–1067 (Or.App.1973) ; State v. Bartolon, 8 Or.App. 538, 495 P.2d 772 (1972).

25. People v. Hamilton, note 21 *supra* ("But there are and should be rigid limitations on the admission of such testimony.") ; People v. Dalton, 201 Cal.App.2d 396, 20 Cal.Rptr. 51, 57 (1962) ; People v. Finch, note 24 *supra*.

The minimum requirement is, of course, the limiting instruction. Commonwealth v. DelValle, 351 Mass. 489, 221 N.E.2d 922, 924–925 (1966). Yet even with such an instruction it is often doubtful that such statements should be admitted if highly prejudicial. *Id. See also* text *infra* at 22–23. ("Exclusion Even Where Relevant"). *DelValle* also holds that threats preceding a crime can properly come only from one who heard or witnessed them. 221 N.E.2d at 926.

26. "It may be that an inference as to the victim's conduct can be drawn from the victim's state of mind, but certainly no permissible inference can be drawn therefrom as to defendant's character or actions." People v. Purvis, note 24 *supra*, 13 Cal.Rptr. at 804, 362 P.2d at 716. *See also* State v. McCauley, 8 Or.App. 571, 494 P.2d 438, 442–443 (1972) ; State v. Kump, 76 Wyo. 273, 301 P.2d 808, 812 (1956).

27. "Dr. Shepard poisoned me." 290 U.S. at 98, 54 S.Ct. 22.

28. And note, in *Shepard* the deceased's state of mind was highly relevant on the issue of possible suicide.

lysts, that our rules of evidence are framed. They have their source very often in considerations of administrative convenience, of practical expediency, and not in rules of logic. When the risk of confusion is so great as to upset the balance of advantage, the evidence goes out.

*Id.* at 104, 54 S.Ct. at 25. *See also* People v. Talle, 111 Cal.App.2d 650, 245 P. 2d 633, 645 (1952);[29] People v. Hamilton, 55 Cal.2d 881, 13 Cal.Rptr. 649, 362 P.2d 473 (1961).[30]

### B. *Relevance*

The threshold requirement of admissibility of such hearsay statements of fear of defendant in homicide cases is some substantial degree of *relevance* to a material issue in the case. While there are undoubtedly a number of possible situations in which such statements may be relevant,[31] the courts have developed three rather well-defined categories in which the need for such statements overcomes almost any possible prejudice. The most common of these involves defendant's claim of self-defense as justification for the killing.[32] When such a defense is asserted, a defendant's assertion that the deceased first attacked him may be rebutted by the extrajudicial declarations of the victim that he feared the defendant, thus rendering it unlikely that the deceased was in fact the agressor in the first instance. Second, where defendant seeks to defend on the ground that the deceased committed suicide, evidence that the victim had made statements inconsistent with a suicidal bent are highly relevant.[33] A third situation involves a claim of accidental death, where, for example, defendant's version of the facts is that the victim picked up defendant's gun and was accidentally killed while toying with it.[34] In such cases the deceased's statements of fear as to guns or of defendant himself (showing he would never go near defendant under any circumstances) are relevant in that they tend to rebut this defense. Of course, even in these cases, where the evidence is of a highly prejudicial nature, it has been held that it must be excluded in spite of a significant degree of relevance.[35]

29. "Everything said in the Shepard case is here applicable. Here was a voice from the grave charging appellant with past acts of brutality and cruelty and charging that he had made threats against his wife's life. How could the jury possibly disentangle the charges in that letter and treat the letter only as evidence of state of mind, and forget about the substance of the charges? How could the defendant meet such a situation? He could not cross-examine the deceased. Her lips were sealed. . . . It will not do to say that it was admitted for the limited purpose of showing state of mind of the deceased, and, even if erroneously admitted, could not be prejudicial." 245 P.2d at 645.

30. "It will not do to say, as does the attorney general, that the jury was told that these declarations were not to be considered for their truthfulness but merely as verbal acts casting light upon [the victim's] state of mind. It is difficult to believe that even the trained mind of a psychoanalyst could thus departmentalize itself sufficiently to obey the mandate of the limiting instruction. Certainly a lay mind could not do so." 13 Cal.Rptr. at 657, 362 P.2d at 481.

31. An example is where a specific mens rea is at issue. People v. Hamilton, note 21 *su-*

*pra* (premeditated murder versus second degree murder). Of course, state of mind testimony may be relevant in all types of cases, criminal and civil. The most common situation in civil cases used to be in actions for alienation of affections. *E. g.*, Adkins v. Brett, 184 Cal. 252, 193 P. 251 (1920). In criminal cases such statements may also well be exculpatory. *E. g.*, People v. Dalton, note 25 *supra*.

32. *See* cases discussed at 768–769, *infra* ("Self-Defense Cases").

33. Commonwealth v. DelValle, note 25 *supra*. The *Shepard* case is to the same effect, although there the statements were excluded as too prejudicial even though relevant to the issue of possible suicide.

34. People v. Lew, note 21 *supra;* State v. Bartolon, note 24 *supra* (statement of fear of guns standing alone would have been admissible, but such statement was inseparable from statement of past acts and therefore excluded); People v. Cooley, 211 Cal.App.2d 173, 27 Cal.Rptr. 543, 557–558 (1963).

35. Shepard v. United States, 290 U.S. 96, 54 S.Ct. 22, 78 L.Ed. 196 (1933); People v. Hamilton, note 21 *supra;* People v. Lew, note 21 *supra*.

## III. SURVEY OF PERTINENT AUTHORITY

An extensive examination of the relevant authorities on this subject reveals an unsatisfactory state of the law. There may be few other evidentiary questions as to which the courts are so confused or the cases so irreconcilable (even within the same jurisdiction). Some courts simply use it as a pretext for allowing in virtually any hearsay evidence, while others summarily exclude it without analysis or discussion. To add to the difficulties, only the relatively recent cases (within the last 20–30 years) are of any real help in analyzing the problem intelligently because the vague and inscrutable "res gestae" doctrine invariably clouded the opinions of the older cases. Quite a few of these earlier cases did exclude such statements under the "res gestae" analysis but are of little aid to this discussion.[36]

### A. Self-Defense Cases

Perhaps the most appealing and consistent decisions are those involving the claim of self-defense. Here the cases are largely in agreement in allowing such testimony where self-defense is in issue and excluding it where it is not. Some discussion of these decisions is helpful in understanding the proper approach in such cases.

In People v. Schindler, 273 Cal.App.2d 624, 78 Cal.Rptr. 633 (1969), a prosecution witness was permitted to testify that the deceased had stated in a telephone conversation that "the gun was missing from the closet and she was afraid her husband was going to kill her." The court recognized that to determine whether the evidence was properly admitted, it must examine the issues. It found that since self-defense was raised, the deceased's fear of the defendant was relevant to the "likelihood of her having taken aggressive action against appellant. If June [the victim] were afraid of appellant and fearful that he might kill her, then an inference could be drawn that it was unlikely she would do anything to provoke him and unlikely that she would produce a loaded firearm at a time when appellant was angry and had just quarreled with her. Because of the defense of self-defense June's state of mind . . . became relevant and the evidence became admissible on the issue . . . ." 78 Cal. Rptr. at 640–641.

Another homicide case, People v. Atchley, 53 Cal.2d 160, 346 P.2d 764 (1959), cert. dismissed, 366 U.S. 207, 81 S.Ct. 1051, 6 L.Ed.2d 233 (1961), involved a claim by the defendant that the victim (his wife) had previously threatened to kill him and had been the initial aggressor in the fight which led to her death. The defendant claimed the gun went off accidentally in the struggle. To rebut this the prosecution introduced a letter of the wife purportedly written to a judge two days before her death to the effect that defendant had threatened her and that she was afraid of him. The court ruled this evidence to have been correctly admitted, stating: "It tended to prove her fear of defendant, which was relevant to defendant's claim that she was the aggressor in a struggle for the gun. Since the claim of self-defense was raised as part of the defendant's case, the letter was admissible in rebuttal." 346 P.2d at 770.

Similarly in People v. Finch, 213 Cal. App.2d 752, 29 Cal.Rptr. 420 (1963), another case of uxoricide, the defendant also claimed that in attempting to disarm his wife the gun went off and killed her accidentally. Again, in rebuttal, the prosecution introduced evidence of the wife's statements of fear for her life and her declarations of specific threats and past assaults by her husband. The court held the statements admissible since they bore directly on the question of the probability that she would assault

---

36. "The phrase 'res gestae' has long been not only entirely useless, but even positively harmful." VI Wigmore on Evidence § 1767 at 182 (3d ed. 1940). A survey of a number of the older cases excluding this type of evidence under the res gestae analysis appears in State v. Kump, note 26 *supra*, 301 P.2d at 812–814.

her husband with the gun in the first instance.[37]

And in People v. Livingston, 271 Cal. App.2d 628, 77 Cal.Rptr. 53, 54–55, 58 (1969), a witness testified in a case tried to the court that the deceased had said "he [the defendant] was arguing and talking about shooting me and stuff," and had requested the witness to pull the shades and lock the door and not to let anyone in without inquiring as to his identity. The court held these statements admissible under the state of mind exception to show her fear of the defendant solely because the defendant had raised an issue of self-defense. "Defendant had claimed that she was the aggressor and that the gun went off accidentally while defendant was trying to wrest it from her. The state of [the victim's] mind was therefore an issue which was circumstantially relevant . . . ." 11 Cal.Rptr. at 58. *See also* People v. Spencer, 71 Cal.2d 933, 80 Cal. Rptr. 99, 458 P.2d 43 (1969); People v. Yuhas, 222 Cal.App.2d 61, 34 Cal.Rptr. 698 (1963).

Conversely, where self-defense is not at issue, such evidence has been excluded. For example, in People v. Ireland, 70 Cal.2d 522, 75 Cal.Rptr. 188, 450 P.2d 580 (1969), the prosecution offered to show that the deceased had said prior to her death, "I know he's going to kill me. I wish he would hurry up and get it over with. He'll never let me leave." The prosecution urged that this was admissible as bearing on the victim's state of mind which was relevant to "show the probabilities of the decedent's conduct . . . that she would not have done anything to provoke him." The defense argued that the deceased's state of mind was not relevant to any issue in the case. The California Supreme Court agreed, holding that the "acts or conduct of the declarant . . . at the time of the homicide were simply not in dis-

pute." There was no defense of self-defense raised in the case. "In such circumstances it must be concluded that the hearsay statement . . . was improperly admitted into evidence." 75 Cal.Rptr. at 193.

Similarly, in State v. Kump, 76 Wyo. 273, 301 P.2d 808 (1956), the prosecution introduced certain statements of the deceased relating various threats made by the defendant and the victim's general state of fear. In spite of a limiting instruction to the effect that the jury was to consider the testimony solely as "tending to show the attitude of mind of the deceased towards the defendant at the time of [the victim's] death," the Wyoming Supreme Court held it to have been error to admit such statements:

> The attitude of the mind of deceased toward the defendant as evidenced by outward manifestations, such as declarations, is at times relevant when the defendant pleads self-defense. [citations] In such case the attitude of mind is to show the *hostile* attitude of the deceased which would justify self-defense or perhaps reduce the degree of the crime, or the severity of the sentence. That is not the situation in the case at bar. The important fact here is the attitude of mind of the *defendant,* not that of *deceased.* The attitude of mind of the deceased toward the defendant was immaterial. (emphasis in original)

301 P.2d at 812. *See also* People v. Purvis, 56 Cal.2d 93, 13 Cal.Rptr. 801, 362 P.2d 713 (1961).

B. *Exclusion Even Where Relevant*

Other cases have excluded testimony of this kind even where the victim's state of mind *was* in issue and where a limiting instruction had been given. This result is reached where the risk of prejudice of an exceptionally damning nature is so high that even a substantial

---

37. Under the view expressed in *Hamilton,* the statement in this case should probably have been excluded since it contained numerous references to past conduct on the part of the accused and as such was highly prejudicial. People v. Hamilton, *supra* note 21; *see* discussion at 775 *infra* ("Statements recounting past acts of the defendant").

amount of relevance is outweighed—especially in light of the strong possibility that the limiting instruction in such situations would be futile. For example, in People v. Lew, 68 Cal.2d 774, 69 Cal. Rptr. 102, 441 P.2d 942 (1968), the trial court's admission of a variety of hearsay statements of the victim, including a number of alleged threats made by the defendant, was held to be error by the California Supreme Court. The court first analyzed the issues to see if the statements were relevant to any inquiry necessary to the case. It found that they were relevant to defendant's claim that the victim had been handling the gun when it went off accidentally and killed her in that it rebutted the likelihood that she would do so because of her fear of guns and of the defendant. Nevertheless, the court held that it was error to have admitted the testimony since it implied past misconduct on the part of the defendant and was also essentially unreliable. The court stated that "such testimony is not admissible . . . because to try to separate state of mind from the truth of the charges is an almost impossible task." 69 Cal.Rptr. at 105, 441 P.2d at 945.

The *Lew* case relied principally on People v. Hamilton, 55 Cal.2d 881, 13 Cal.Rptr. 649, 362 P.2d 473 (1961), an important case in California decided by a 4 to 3 vote and often cited on this issue. In *Hamilton* the only question was whether the defendant had committed first-degree or second-degree murder. He admitted killing the deceased, but claimed it had been done without premeditation and deliberation and that he had gone to his wife's (the victim) house at her invitation. In rebuttal the prosecution introduced over objection statements made by the wife to witnesses that she was afraid of the defendant, that he had beaten her and that he had threatened to kill her. The jury was carefully instructed not to consider these statements as true as to the beatings, but only as state of mind evidence. The California Supreme Court nevertheless held it error to admit such testimony since the state of mind was necessarily dependent on some past acts of the defendant that were very prejudicial to his case and that it was beyond the jury's power to distinguish the purposes for which the evidence was admitted.[38]

Such cases as *Lew* and *Hamilton* are illustrative of precisely the type of balancing that must take place as to each particular statement that seeks admission under the state of mind exception in light of all the facts and circumstances of each case. In these cases it was determined that a certain degree of relevance was insufficient to outweigh the inevitably damaging prejudice inherent in the statement. And certainly where no convincing need for the evidence can be demonstrated or where no limiting instruction is given, exclusion of the evidence is mandatory, a fortiori.

## C. *Anomalous Decisions*

Let there be no mistake about the uniformity of the cases dealing with this issue—there are many that are irreconcilable. Even in jurisdictions where a seemingly consistent rule obtains, there are decisions which are conflicting and unexplainable. The *Merkouris* case in California is such a case—it has caused a good deal of difficulty in that state.[39] People v. Merkouris, 52 Cal.2d 672, 344 P.2d 1 (1959). Here the court found that declarations of homicide victims as to their fear of the defendant caused by his threats on their lives[40] were correctly admitted into evidence. However, the court ruled that the purpose for which such evidence could be used included indicating the probable identity of the killer, *i. e.*, defendant:

> Where, as here, the identification of defendant as the killer is in issue, the fact that the victims feared defendant

---

38. Note 30 *supra*.

39. The California cases are otherwise reasonably consistent.

40. There was also testimony that one of the victims got a gun to protect himself because the defendant was bothering him again. 344 P.2d at 6.

is relevant because it is some evidence that they had reason to fear him, that is, that there is a probability that the fear had been aroused by the victims' knowledge of the conduct of defendant indicating his intent to harm them rather than, e.g., that the victims' fear was paranoid. (Karnes v. Commonwealth, 125 Va. 758, 99 S.E. 562, 564[4] et seq., 4 A.L.R. 1509; Lowrey v. State, 87 Okl.Cr. 313, 197 P.2d 637, 651[14, 15]; State v. Bauers, 25 Wash.2d 825, 172 P.2d 279, 286–287[8]–[9].[41]

People v. Merkouris, *supra*, 344 P.2d at 6. Such an approach violates the fundamental safeguards necessary to the use of such testimony (*see* note 26 *supra*). Through a circuitous series of inferences, the court reverses the effect of the statement so as to reflect on *defendant's* intent and actions rather than the state of mind of the declarant (victim).

This is the very result that it is hoped the limiting instruction will prevent.[42] Second, it is probably in conflict with the Supreme Court's *Shepard* doctrine. That is, the hearsay statement is being used to indicate past conduct on the part of the defendant of an extremely inculpatory nature—to be precise, that it tends to support the conclusion that he in fact was the killer. In allowing this inference the court is permitting the same type of "accusatory words [which] would drown all weaker sounds." And here the court is offering this as a proper use of such testimony where the correct approach is concerned with whether juries can *avoid* drawing such inferences even with the help of the admonitions of the limiting instruction. Due to substantial disapproval of this case, it appears questionable as to whether a California court presented with the *Merkouris* facts at this time would continue to abide by its holding.[43]

41. Some mention should be made about the three cases cited as authority in this quotation from *Merkouris*. These opinions are essentially conclusory in nature and notably lacking insight or analysis.

In Karnes v. Commonwealth, 125 Va. 758, 99 S.E. 562 (1919), the court held that statements of fear were admissible as indicating the probable identity of the killer and that it was error for the trial court to have excluded them. The evidence was exculpatory of the defendant and tended to indicate that another person committed the crime. The decision relies somewhat cryptically on Mutual Life Ins. Co. v. Hillmon, 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892), as well as some sort of res gestae analysis. The case has been briefly but effectively criticized in Payne, The Hillmon Case Revisited, 41 Va.L.Rev. 1011, 1035–36 (1955).

State v. Bauers, 25 Wash.2d 825, 172 P.2d 279 (1946), is a case often cited by courts seeking to admit such evidence. The opinion is obscure. It first analyzes the statement of fear as an "opinion" and then proceeds with what appears to be a res gestae analysis. *Id.* at 287. Finally, it also asserts that the evidence is admissible under the general rule that the statements were made in the presence of the accused, were of an accusatory nature and were not denied by him at the time (an "adoptive admission"). The opinion never addresses the relevance issue and it is clear that the deceased's state of mind was not relevant. Moreover, it also

appears to allow the multiple inference to be drawn that the statement could reflect on the guilt of the defendant. As such it seems to violate Shepard v. United States, 290 U.S. 96, 54 S.Ct. 22, 78 L.Ed. 196 (1933), and has been criticized on those grounds. Comment, 22 Wash.L.Rev. 145 (1947).

Lowrey v. State, 87 Okl.Cr. 313, 197 P.2d 637 (1948), at least recognized such testimony should be limited to showing the state of mind of the deceased and should not have been used as proof of the alleged facts stated. Nevertheless, it did not reverse the trial court for allowing in the evidence since it felt that any error that might have occurred was not prejudicial. The court seemed to rely on the fact that there was corroborative evidence of the deceased's statement of fear. *See* discussion of the proper role of corroboration, notes 60–66 *infra* & accompanying text.

42. This was also the very result feared by the commentators as a logical extension of the much criticized *Hillmon* case. Seligman, An Exception to the Hearsay Rule, 26 Harv.L.Rev. 146 (1912); Payne, The Hillmon Case Revisited, 41 Va.L.Rev. 1011, 1036 (1955).

43. While the *Merkouris* decision was followed in People v. Feasby, 178 Cal.App.2d 723, 3 Cal.Rptr. 230 (1960), this decision is distinguishable in that it involved real issues as to the *victim's* state of mind, e. g., self-defense, which made the testimony relevant. In

There are a number of other cases which have allowed in testimony of this type on the basis of various errors in reasoning or simple lack of concern. One of the principal problems which brings this about is a court's understandable eagerness to find an "easy" rule, simple in operation. This leads to a tendency to adopt a mechanistic approach devoid of analysis. For example, in State v. Radabaugh, 93 Idaho 727, 471 P.2d 582 (1970), the Idaho Supreme Court, dealing with a hearsay declaration of fear on the part of the deceased victim,[44] simply identified the statement as probative on the issue of the state of mind of the declarant, referred to the fact that a limiting instruction had been given and then pronounced it admissible in a conclusory and offhanded manner.[45] Such a simplistic approach sidesteps any preliminary determination of relevance and does not begin to weigh the possible prejudice contained in such statements.

Another group of cases seems to consider such hearsay admissible if there are circumstantial indications of its reliability or some type of corroborative evidence. For example, in State v. Shirley, 7 Or.App. 166, 488 P.2d 1401 (1971), the court found the declaration of fear to have been made in a manner " 'perfectly natural' under the circumstances." 488 P.2d at 1403. Also in People v. Pinn, 17 Cal.App.3d 99, 94 Cal.Rptr. 741 (1971), the court referred to the California statute on state of mind testimony and remarked: "the appellant has not directed our attention to anything in the record indicating that [the victim] made the statement . . . in other than a natural manner. . . . [I]t was therefore admissible under section 1250." 94 Cal. Rptr. at 745–746.[46]

Similarly, in State v. Gause, 107 Ariz. 491, 489 P.2d 830 (1971), the Arizona Supreme Court, apparently attempting to adopt a "progressive" approach, laid down a rule that such expressions of fear are admissible as long as they have sufficient reliability.[47] While an at-

---

*Purvis*, note 24 *supra*, a case excluding such evidence, even the dissenting judge disapproved *Merkouris* in these words:

> [The testimony in question] went far beyond that necessary to show a relevant state of mind of the victim. People v. Merkouris . . . should not be extended (and People v. Feasby (1960), 178 Cal.App.2d 723, 733–734 [14–17], 3 Cal. Rptr. 230, should not be construed) to permit the introduction in evidence, without discrimination, of all sorts of accusations against a defendant by the victim of a homicide, upon the theory that the victim's state of mind is relevant.

362 P.2d at 719–720.

In People v. Lewis, 217 Cal.App.2d 246, 31 Cal.Rptr. 817 (1963), a California court faced with similar facts reluctantly followed *Merkouris* only because it felt constrained by *stare decisis* to do so. "While a persuasive argument can be made that declarations of the nature herein involved should be inadmissible, this court is not free to depart from the reasoning of the Supreme Court in the Merkouris case." 31 Cal.Rptr. at 824. And in still a later case, the *Merkouris* dissent was cited by the California Supreme Court with approval. People v. Lew, note 21 *supra*, 441 P.2d at 944. Subsequently the California Law Revision Commission drafted a proposal for overruling the *Merkouris* case

by legislation. The proposal sought to limit the use of such testimony to modify or describe only the acts of the *declarant*. *See* Commonwealth v. DelValle, note 25 *supra*, 221 N.E.2d at 925.

44. "I'm scared to death of him, not so bad when he's drinking beer, but when he's drinking whiskey he's crazier than a tick." 471 P.2d at 585 n. 9.

45. "Thus since the first statement was probative of the attitudes and feelings (fear) of the victim towards Radabaugh, it was properly admitted." 471 P.2d at 586 (no citation of authority).

46. This is an improper use of corroboration evidence. As to the proper role of such evidence, *see* note 66 *infra* & accompanying text. For the California statutes, *see* note 22 *supra*.

47. "Let us meet the problem head-on, brush aside the sophistry, and say that expressions of fear by a murder victim, though they made be hearsay, are relevant, have probative value on the issue of identity, and, when in human experience they have sufficient reliability they should be admitted in evidence." 489 P.2d at 834. In this case there was in fact a good deal of corroboration:

> A bald expression of fear by a murder victim standing alone does not have suffi-

tempt to break out of the confines of some of the archaic niceties of the hearsay exceptions in favor of a rule of admissibility dependent only on the presence of special guarantees of reliability has something to commend it, this only answers half the question. That is, the *Gause* court (and the other courts which place so much reliance on such indications of special trustworthiness) failed to move on to the second question—that of relevance which also has something to commend it. The court's rule simplified the question of whether certain testimony falls within the state of mind exception to the hearsay rule but entirely ignored the relevance balancing process which seeks to avoid undue and unnecessary prejudice and confusion.[48]

The undesirable results of the application of such a single-step approach become apparent in those cases in which courts allow the admission of such hearsay declarations of fear in spite of the fact that the state of mind of the declarant simply bears too tenuous a relationship to the issues in the case. For example, in State v. Shirley, 7 Or.App. 166, 488 P.2d 1401 (1971), the court, on facts strikingly similar to those at hand here,[49] felt that the evidence should be admitted on the rather flimsy ground that "[t]he state had a right to show the state of mind of the victim at the time of and shortly prior to the homicide and for that purpose to show what circumstances as expressed by the victim contributed thereto." 488 P.2d at 1403. *See also* People v. Pinn, 17 Cal.App.3d 99, 94 Cal.Rptr. 741 (1971);[50] Lowrey v. State, 87 Okl.Cr. 313, 197 P.2d 637 (1948). Here again there is an undesirable failure to address the relevance issue. The court considered its task at an end merely by identifying the statement as bearing on the victim's state of mind, neglecting to undertake the vital step of balancing the necessity for the evidence and its probative value against the strong likelihood of extremely damaging prejudicial effects.

## IV. SYNTHESIS OF THE APPLICABLE PRINCIPLES

■ The rule then to be distilled from the better reasoned decisions is that a victim's extra-judicial declarations of fear of the defendant are admis-

---

cient reliability to be admitted. In fact, if the victim were alive to testify, a foundation would be required before her expression of fear would be admissible. There is considerable testimony in the record here to show that the victim had a valid basis for fearing her husband. Domestic problems, the filing of a divorce action, the necessity for a restraining order, the removal of the victim to a hotel until the husband vacated the house, and the threats to kill voiced by the defendant husband in the presence of others, all accord a special reliability.
*Id.*

48. The statement in the opinion italicized below is particularly flagrant in its disregard of a valid and accepted policy consideration in its headlong breathless' charge to "brush aside the sophistry."
 We note that in the cases on this and related points the courts often resort to strained logic to attain the desired result. In determining the identity of the person committing a murder, the fact that the victim had reason to fear the defendant has some probative value. The indicia of reliability of the hearsay statements are as certainly present on the question of identity as they are on the issue of accident or suicide. *We fail also to grasp the attempted distinction regarding when the state of mind of the victim is or is not in issue.* We are not impressed with pious instructions to the jury which tell them to consider the statements of the victim only for the purpose of determining the victim's state of mind.
489 P.2d at 833 (emphasis added).

49. Also involving a drug pusher's "disciplining" of one of his colleagues.

50. Evidence of the victim's statement indicating her fear of appellant not only provided a basis for reasonable inferences contradictory of appellant's version of the relevant events, including [the victim's] actions, but it also provided a basis for the reasonable inference that [the victim] probably repelled his sexual advances and that it was this action on her part which caused appellant to attack her and inflict upon her the wounds which caused her death.
94 Cal.Rptr. at 745.

sible under the state of mind exception to the hearsay rule with a limiting instruction only if there is a manifest need for such evidence, *i. e.,* if it is relevant to a material issue in the case. Where there is a substantial likelihood of prejudice to the defendant's case in the admission of such testimony, it is inadmissible if it bears only a remote or artificial relationship to the legal or factual issues raised in the case. Even where there is substantial relevance, the additional factual matters in the statement may simply be too explosive to be contained by the limiting instruction, in which case exclusion of the testimony is also necessitated.

The trial judge must undertake the familiar balancing process in which the relative degrees of relevance and prejudice are weighed and determined. But what is really meant by the conclusory and often abused terms "relevance" and "prejudice"?

### A. *Relevance*

 Close examination reveals that there are in fact two "relevances" which must coexist. First, the victim's state of mind must be relevant to some material issue in the case as, for example, where an issue of self-defense, suicide, or accidental death is raised by defendant. Second, the extrajudicial statement

itself must be probative on that question of the victim's state of mind once it is conceded that this is a valid and relevant inquiry.[51]

An illustration of a fatal deficiency in this latter element of relevance is the *Shepard* case itself. In *Shepard* it was clear that the state of mind of the deceased *was* relevant to a material issue in the case—the defense of suicide. However, the statement "Dr. Shepard poisoned me" is of extremely slight probative value on the deceased's will to live (or in Justice Cardozo's words "the existence of a vital urge") and is at the same time, of course, immeasurably prejudicial. Similarly, in Commonwealth v. DelValle, 351 Mass. 489, 221 N.E.2d 922 (1966), the Massachusetts Supreme Court was presented with a prosecution argument that statements of fear based on defendant's prior threats were relevant in rebutting the defense of possible suicide. However, the court, after surveying most of the relevant authorities, found the declaration to be of insufficient probative value to justify its admission in the face of the substantial prejudicial dangers involved in the jury's inferring the defendant's guilt from such statements in spite of a limiting instruction.[52] *Cf.* Benwell v. Dean, 249 Cal.App.2d 345, 57 Cal.Rptr. 394 (1967).[53]

---

51. There is no lacking of this second element of relevance in the case at hand. That is, the statement is certainly probative on the declarant's state of mind if that were relevant to the case.

52. The evidence of threats did not show a state of mind inconsistent with the possibility of suicide. At best it demonstrated only a state of fear on the part of the deceased. It neither rebutted nor reinforced the theory of suicide. Conceivably fear could have driven the deceased to self-destruction. Conversely it might not have. On this point there is a blank record. Thus, evidence of the threats introduced solely to show the declarant's state of mind was immaterial. Furthermore, the admission of such evidence served to express the intent and subsequent action of the defendants, i. e., they wanted to kill

the deceased, they so state, and they did kill him.
221 N.E.2d at 924.

53. In Benwell v. Dean, a wrongful death action, the court found the decedent's state of mind to be relevant to the issues in the case (on the measure of damages) but found the statement itself to be insufficiently probative on that state of mind when compared to the severe damage that would result to the defendant's case were the jury to misuse it. Since there was a strong likelihood that the jury would be unable to comply with the limiting instruction, the court upheld the exclusion of the testimony. "In the present case the true evidentiary bearing of the subject declarations was at best slight and remote, yet of a nature as to make them very prejudicial against plaintiff." 57 Cal.Rptr. at 401.

## B. *Prejudice*

Prejudice is, of course, just another way of saying "harm to defendant's case." The crucial inquiry is how *much* harm will ensue [54] and how *likely* it is to occur. This in turn is weighed against the need for the evidence as dictated by the two "relevances" described above. The likelihood of the harm resulting can in turn be translated essentially into the question of the probability of jury misuse of the testimony as measured by the probable efficacy of the limiting instruction. We do not mean to infer that prejudice should be presumed in most cases to outweigh need, for some prejudice is bound to occur. What is called for is a fair judicial balancing of the factors.

■ A number of factors should be considered in making these determinations. An illustrative few:

### 1. *Statements recounting past acts of the defendant*

One of the principal concerns voiced in the cases revolves around state of mind testimony that is inextricably bound up with the relation of past events or conduct on the part of the accused. Rarely does the testimony stop at the point "I am afraid of D [defendant]". More often it is expressed: "I am afraid of D because he beat me and threatened to kill me." Most courts are rightly leary of such testimony since it

crenches closely upon the Shepard doctrine. Shepard v. United States, 290 U. S. 96, 54 S.Ct. 22, 78 L.Ed. 196 (1933). After *Shepard,* it has been unquestionably accepted that to allow hearsay statements which relate past events on memory or belief under the state of mind exception would in effect swallow the hearsay rule.[55] Therefore no court would admit such testimony for the purpose of proving the truth of the matter alleged, yet many will accept it if introduced solely on the state of mind issue with a limiting instruction. But, as in *Shepard,* when such statements bear close proximity to the issue of guilt or innocence it is equally clear that the limiting instruction may be of dubious utility at best. Thus the more narration of past acts or conduct of the defendant contained in the statement, the greater the danger of jury misuse. People v. Lew, 68 Cal.2d 774, 69 Cal.Rptr. 102, 441 P.2d 942 (1968); People v. Hamilton, 55 Cal.2d 881, 13 Cal.Rptr. 649, 362 P.2d 473 (1961).

### 2. *Proximity to the vital issues in the case*

As stated above, statements which contain descriptions of past acts of the accused become insuperably prejudicial when the recital of such acts bears on the central issue of guilt or innocence. For example, in a trial for criminal assault, the statement "I am afraid of D [defendant]" made by the victim might

---

54. Note that in determining the extent of the possible harm there is some inevitable overlap with the logically distinct question as to whether, once it is determined that error has been committed in the balancing process and the testimony wrongly admitted, the error is so prejudicial as to mandate a reversal.

55. *See, e. g.,* People v. Hamilton, note 21 *supra,* 362 P.2d at 481; Proposed Rules of Evidence for the United States Courts, Rule 803 (1973):

Rule 803.

HEARSAY EXCEPTIONS: AVAILABILITY OF DECLARANT IMMATERIAL

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

```
* * * * *
```

(3) Then existing mental, emotional, or physical condition. A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), *but not including a statement of memory or belief to prove the fact remembered or believed* unless it relates to the execution, revocation, identification, or terms of declarant's will. (emphasis added).

No changes were recommended in this provision by the Subcommittee on Criminal Justice of the House Judiciary Committee. H. R. 5463, 93d Cong., 1st Sess., Committee Print (June 28, 1973).

be very relevant on the issue of self-defense. However, the statement "I am afraid of D—he beat me last week" is so close to the ultimate issue at hand that there is a greater danger that the jury will misuse the statement and assume some truth to the allegation of past conduct on the part of D.[56]

Even where past conduct of the defendant is not explicitly related, the proximity of the statement to the central issues is a key factor in determining the degree of prejudice. For example, the simple statement "I am afraid" contains no extraneous factual matters; and, if the declarant's state of mind is at all relevant, there is very little conceivable prejudice to the defendant. However, the statement "I am afraid of D [defendant]" is more dangerous. It gives rise to the natural inference that there has been some past conduct on the part of defendant to justify such a fear, e. g., past beatings or threats, or even that the statement accurately reflects on *defendant's* state of mind and intentions.[57] For example, where the trial is for murder by stabbing, the statement "I am afraid that D is going to knife me" is much further along on the spectrum of possible prejudice.[58] If descriptions of past conduct are also added in, the prejudicial dangers are even greater, e. g., "I am afraid that D

will knife me—he has attacked me with a butcher knife twice last week." [59]

### 3. *Corroboration*

A number of cases discuss corroboration by other testimony of the matters related in the deceased's statement. Yet it is unclear what the proper effect of corroboration should be. Some cases assert that the hearsay description of past conduct is made acceptable if supported by additional evidence indicating the reliability of the statement, i. e., indicating that the past events did in fact take place as described.[60] Others seem more willing to admit statements of fear if there is external corroboration of the fact that the declarant was truly afraid, e. g., outward non-verbal manifestations of fear by the declarant [61] or by others at the time of the statement.[62] There is also substantial confusion as to whether such corroboration evidence should be a necessary prerequisite to admissibility,[63] or whether the statement should be prima facie admissible unless there appears to be external indications of *non*-truthfulness.[64]

It seems, however, that such inquiries are unprofitable. If the circumstantial facts contained in the statement can be proven by other independent testimony there seems even less need for the hearsay statement.[65] If they cannot,

---

56. Since such statements could be considered too prejudicial to be admitted even where the victim's state of mind is quite relevant, they would certainly be inadmissible where there is only a peripheral relevance to the case.

57. *See* note 26 *supra*. The prejudice in such a statement could well be outweighed of course, if, for example, self-defense were at issue in the trial.

58. Once again, while it could conceivably be outweighed by a strong need for the evidence, here it is far more likely that the prejudice would preclude such admissibility.

59. The prejudice in such a statement is very high.

60. *E. g.*, State v. Gause, 107 Ariz. 491, 489 P.2d 830 (1971); State v. Shirley, 7 Or. App. 166, 488 P.2d 1401 (1971). The Cali-

fornia statute speaks to this requirement of trustworthiness. *See* note 22 *supra*.

61. *E. g.*, People v. Finch, note 24 *supra* (declarant had installed chains on her doors, kept a weapon by her bed, etc.; witnesses testified she was "very, very nervous, extremely upset, was losing weight and could not eat").

62. Lowrey v. State, note 41 *supra* (declarant's father).

63. People v. Hamilton, note 21 *supra;* People v. Lew, note 21 *supra;* People v. Ireland, 70 Cal.2d 522, 75 Cal.Rptr. 188, 450 P.2d 580 (1969).

64. People v. Livingston, 271 Cal.App.2d 628, 77 Cal.Rptr. 53 (1969); People v. Spencer, 71 Cal.2d 933, 80 Cal.Rptr. 99, 458 P.2d 43 (1969).

65. *Cf.* note 17 *supra*.

then the testimony has greater impact and higher unreliability—factors that certainly in no way militate in favor of admissibility. The proper role for corroboration should probably be in determining whether error, if committed, was *reversible* error.[66] Thus if there was substantial corroborative evidence of the circumstantial facts and the trial judge inadvisedly allowed in the hearsay, it could well be argued that such testimony, while undesirable, was harmless error since it did not so distort the validity of the trial as to require reversal.

### 4. *Inflammatory statements*

Where the external facts in the statement are so inflammatory, as to unduly arouse the jury's emotions of prejudice or hostility, *any* evidence, whether or not involving state of mind issues, must be excluded where its probative value is substantially outweighed by its unduly dramatic or emotional impact so as to create a substantial danger of undue prejudice.[67] The application of this rule requires that the trial judge be allowed to exercise a broad discretion.[68]

### C. *Prophylactic Measures for Minimizing Prejudicial Dangers*

### 1. *The limiting instruction*

Good limiting instructions are vital where the possibility exists that the jury will consider the testimony for an improper purpose. The careful and repeated admonitions of the trial judge go far to sustain his judgment on appeal. However, in extreme cases, where the relevance balance is clearly to be struck against the admission of the testimony, the limited utility of the special instruction has been repeatedly recognized by the courts.[69]

Ultimately the amount of reliance one is willing to place on the limiting instruction must necessarily depend on the degree of respect one holds for the jury's ability to make and maintain such fine distinctions. Certainly a compelling argument can be made for the jury's capacity to deal with such problems. *Compare* the argument of the dissenting justice in People v. Hamilton, note 21 *supra*, 13 Cal.Rptr. at 663, 362 P.2d at 487 (White J., dissenting):

> To me it seems a sad commentary upon the intelligence of jurors, in the light of the court's constant, painstaking and specific admonitions, to say that they were unable to follow them or that in violation of their sworn obligations as jurors they cast aside such admonitions. I cannot indulge in either of those assumptions . . .

*with* the majority's statement:

> It is difficult to believe that even the trained mind of a psychoanalyst could thus departmentalize itself sufficiently to obey the mandate of the limiting instruction. Certainly a lay mind could not do so.

*Id.* 13 Cal.Rptr. at 657, 362 P.2d at 481.

While to a certain extent this is a policy question and a matter of opinion, the United States Supreme Court in such cases as *Shepard* and *Bruton*[70] has clear-

---

66. *See* pp. 781–782 *infra*.

67. McCormick on Evidence § 185, at 438–39 (2d ed. 1972) ; Uniform Rules of Evidence, Rule 45; Proposed Federal Rules of Evidence § 403. The application of this rule to direct evidence has been questioned :

> It is sometimes said that the process of balancing probative value against prejudice applies to circumstantial evidence only, Bunten v. Davis, 82 N.H. 304, 133 Atl. 16, 45 A.L.R. 1409 (1926) ; State v. Whitener, 228 S.C. 244, 89 S.E.2d 701 (1955). The value of direct evidence is not easily over-balanced, but the recognized power of the court to prevent excessive cumulation of witnesses shows that the general rule, at least in some of its aspects, is applicable to direct as well as to circumstantial proof. Cases are collected in the annotations on limitation of witnesses in 5 A.L. R.3d 169, 328.

> McCormick, *supra* at 439 n. 30.

68. McCormick, note 67 supra, § 185, at 440 n. 35.

69. *See* notes 19–21 *supra* & accompanying text. In both People v. Hamilton, note 21 *supra*, and People v. Lew, note 21 *supra*, repeated and careful instructions were insufficient to prevent prejudicial and reversible error.

70. Notes 20, 28 *supra*.

ly indicated it believes that there are sharp limits to the capabilities of the jury to comply with special instructions as to highly incriminating evidence of this type.[71] Therefore in extreme cases such evidence must be excluded in spite of the limiting instruction.

### 2. Deletion of Objectionable Testimony

It has been recognized that an efficient method of avoiding unnecessary prejudice where the declarant's state of mind is otherwise relevant is to delete the offensive portions of the statement. Adkins v. Brett, 184 Cal. 252, 193 P. 251, 254 (1920) (cited with approval in McCormick on Evidence § 294, at 696–97 n. 67 (2d ed. 1972). Presumably if the statement could not be so altered without completely losing its sense it must be excluded *in toto*. *Cf*. Bruton v. United States, 391 U.S. 123, 134 n. 10, 88 S. Ct. 1620, 20 L.Ed.2d 476 (1968).[72]

As with most evidentiary questions, especially those involving "balancing," substantial deference to the trial judge's discretion must necessarily be afforded.[73] This opinion is designed to aid in such determinations and to suggest some standards in the hope of achieving more uniformity in an area where the decisions are in a dismaying state of disarray.

## V. THE INSTANT CASE

Applying the above principles to the facts of this case, we first investigate the potential prejudice and then any countervailing relevance.

### A. Prejudice

The prejudicial dangers in the statement in question are substantial but not overwhelming. It is true that the statement is not as incriminating as if it had specifically alleged past acts or past threats. But clearly a palpable danger exists that the jury will infer from the statement of Thelma Parks, testified to on October 16th, that Parks stated "I am afraid I will be killed by Roland Brown"[74] that Roland Brown was a man capable of murder, that he had done things in the past to Parks to justify this fear, or that Brown had explicitly threatened Parks' life in the past. Any or all of the above conclusions are inevitably present in the jury's collective mind. Yet all such inferences insofar as they may reflect on *defendant's* intentions or past conduct would be improperly drawn. Moreover, the statement is

71. This is due in some degree to the attitude of our juries toward our judges. It has been my observation that judges in England go further in their instructions than we do, they expect their juries to abide by the instructions they are given and that their expectations are carried out to a greater degree than is true generally in this country. Some of the difficulty may lie with the courts themselves. Professor Morgan may have come close to the cause when he commented that American courts in the use of limiting instructions exhibit an inconsistent attitude toward juries by "treating them at times as a group of low-grade morons and at other times as men endowed with a superhuman ability to control their emotions and intellects." E. Morgan, Some Problems of Proof Under the Anglo-American System of Litigation 105 (1956), referred to in Bruton v. United States, 391 U.S. 123, 133 n. 8, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

72. The referred footnote states in part:
Some courts have required deletion of references to codefendants where practicable. See, *e. g.*, Oliver v. United States, [118 U.S.App.D.C. 302] 335 F.2d 724; People v. Vitagliano, 15 N.Y.2d 360, [258 N.Y.S.2d 839] 206 N.E.2d 864; People v. La Belle, 18 N.Y.2d 405, [276 N.Y.S.2d 105] 222 N.E.2d 727. For criticisms suggesting that deletions (redaction) from the confession are ineffective, see, *e. g.*, Note, 72 Harv.L.Rev. 920, 990 (1959); Comment, 24 U.Chi.L.Rev. 710, 713 (1957); Note, 74 Yale L.J. 553, 564 (1965).

*See* notes 79–80, 84 *infra* & accompanying text, as to the trial court's refusal to delete the offensive references in this case.

73. People v. Sweeney, note 20 *supra*, 357 P. 2d at 1058 ("it is for the trial court in the exercise of its judicial discretion to determine whether its [the evidence] probative value is outweighed by its possible prejudicial effect and to admit or exclude it accordingly"); People v. Finch, note 24 *supra*, 29 Cal.Rptr. at 430.

74. A paraphrase of the testimony elicited. *See* text at 762 *supra*.

extremely closely related to the issues at hand. The defendant here directly placed his identity in issue, and the challenged testimony expressly names him as the probable murderer. To the jury it must have been as simple as this: Parks feared being killed by Roland Brown, and sure enough Parks was killed. Therefore, odds are good that it was done by Roland Brown. Thus the danger that the statement in question would be misused by the jury on the disputed issue of identity is extremely high.

In order to attempt to minimize this danger, the trial judge was requested to give an immediate limiting instruction.[75] This he refused to do, preferring to include his instruction on this bit of evidence among all the instructions given at the end of the trial.[76] In the circumstances of this case this in itself may be erroneous procedure,[77] because it certainly is not calculated to minimize the prejudicial impact of the testimony. Without the benefit of an immediate guiding instruction, the jury was free throughout the seven remaining days of the trial, until the instruction was given, to assume that the statement would in fact be probative on the issue as to whether Roland Brown actually killed Parks. Realistically the prohibited inference was very probably drawn and most likely served to color the jury's consideration of all subsequent testimony, through the arguments of counsel and until the instruction was finally given by the court on October 23rd. But more importantly, the close proximity of the improper inference to the question of guilt or innocence makes it highly unlikely that the jury sufficiently compartmentalized its consideration of the testimony in obeyance to the limiting instruction ultimately given.[78]

Furthermore, the trial court refused to excise the reference to the defendant. While this simple step could well have minimized the possibility that the jury would conclude that Brown had threatened Parks' life in the past and the possibility that the jury would apply the statement on the issue of identity to conclude that Brown was the actual murderer, the court assumed that deletion of Brown's name was an improper technique.[79] Moreover the court's refusal came in spite of the fact that the prosecuting attorney himself, undoubtedly aware of the prejudicial dangers inherent in such testimony, explicitly offered to elicit the statement from the witness without reference to the defendant.[80]

---

75. Tr. 445.

76. MR. CHOROSZEJ: Your honor, for the record, the defense will note the objection to the Court's ruling.

I also request that the Court give instructions to the jury as to the limitation —

THE COURT: I have already told you about instructions, counsel. Any instructions you want me to give that are special specify the instruction and the authority for it. We will discuss instructions at the end of the case if it goes to the jury.

MR. CHOROSZEJ: Yes, I was aware at the end of the case, but perhaps a cautionary instruction to the jury as to the relevance of the testimony—

THE COURT: No, I will not give that. I do not think I am required in the course of the trial to give any special instructions with respect to this evidence. It is admitted, in the Court's judgment, as an exception to the hearsay rule, and it is relevant under the Government's theory of its case. Tr. 445–46.

77. Lowther v. United States, 455 F.2d 657, 665 (10th Cir. 1972) (where the court gave clarifying instructions with respect to certain testimony during the trial there was no need to limit it through a general instruction at the end of the trial); Fountain v. United States, 384 F.2d 624, 632 n. 9 (5th Cir. 1967); United States v. Thomas, 52 F.Supp. 571 (E.D.Wash.1943); cf. United States v. Fench, 152 U.S.App.D.C. 325, 332, 470 F.2d 1234, 1241 (1972).

78. Moreover the instruction was not completely correct in that it obliquely implied that the testimony could be considered as having some bearing on Brown's activities and identity. See note 8 supra.

79. See notes 72–73 supra & accompanying text.

80. MR. HOUCK: [The Assistant U.S. Attorney]

## B. *Relevance*

On the other side of the scale we perceive an overwhelming deficiency in relevance. Here there is no claim of self-defense, suicide, accidental death[81] or any other plausible issue that would justify an inquiry into the *victim's* state of mind. The prosecution seemed to be aware of this need to find some issue which would provide a shred of justification for the admission of the damaging testimony. It was urged that without this statement, the jury would get the case "with a hole in it, with a piece missing."[82] As the transcript indicates, the prosecuting attorney argued for admissibility on the ground that the statement in some cryptic way indicated the victim's movements around the time of the killing.[83] In its brief on appeal the Government now argues:

> Thus the government's proof that Parks was afraid to leave his home and was fearful . . . in the week preceding his death was relevant and probative with respect to whether Parks went to the scene of the murder voluntarily or under duress. Thus Parks' intention not to leave his home was a relevant factor to be considered in the jury's determination of whether appellant was guilty of premeditated and deliberate murder.

Brief for Appellee at 25. The Government thus claims that the evidence showed that the deceased would not voluntarily have left his house and therefore was probably *forced* to be at the location at which he was eventually found dead. Such conclusion, however, even if it had support in the factual context of this case, is too remote from the issues at hand and is too speculative to be accepted. This is not a kidnapping case and there is no point in rebutting some nonexistent defense claim that he went

81. During the course of the trial there was testimony that "Parks was shot accidentally" (Tr. 372, 975) but the type of "accident" there referred to is not the type of "accidental death" discussed above at note 34 & accompanying text. Nadine Frazier, appellant's "girl friend," testified that prior to the trial she went to Lorton Reformatory at his request, and that appellant said:

> A He said he was there [when Parks was killed] and that it was an accident the way it happened; and also that Bootnose was there.

Tr. 372.

> Q Miss Frazier, when Roland W. Brown was talking to you about the killing of Ricardo Parks, what conversation did he tell you, what talking, did he say took place before Ricardo Parks was killed at the place where he was killed?
>
> A He didn't say who it was but that someone was playing with Ricardo Parks with a pistol and said, why don't you pay me the money that you owe me; and that Parks was shot accidentally.

Tr. 375. Appellant took the stand and specifically denied making the latter statement after it was read to him by his own counsel:

> Do you deny that you ever said that to her?
>
> A Yes, sir. I do deny I said that to Nadine Frazier.

Tr. 975. This denial makes it plain that there is no claim by appellant that the shooting was accidental. His defense was an alibi. Likewise the Government does not claim that the shooting was accidental.

82. Tr. 328.

83. MR. HOUCK: . . . The Court held that it was perfectly proper to introduce it with a limiting instruction, which we urge upon the Court, that this testimony is relevant to how Parks got to where he was found dead.

> It is not relevant to who killed him. But the fact that he would go across town to be with this man Rowland W. Brown is an incredible fact, looked at in the context of his fear and of his fear of Roland Brown, unless something less than voluntary action were taken on his part.

The following, from the transcript, reflects the argument on admissibility:

> Now, we urge upon the Court that the Court can rule within its discretion, and certainly within the law, that we excise the portion of the reference to Roland W. Brown; but at least say that he [Parks] was scared of losing his life.
>
> That seems to compromise the positions well within the law and still avoid the prejudice to Mr. Brown.
>
> THE COURT: You do not compromise in that fashion, counselor. Either the testimony is admissible or inadmissible.
>
> MR. HOUCK: The Government submits that in its totality the evidence is admissible.
>
> THE COURT: It is either in totality or it is not.

Tr. 333–34.

voluntarily to meet with defendant. One does not "consent" to be murdered. There thus appears to be no legally relevant purpose for the introduction of this evidence other than for the clearly improper inference it supports as to the probable identity of the murderer.

The prejudice from the introduction of the full statement was manifest and when compared with the tenuous relationship to the issues advanced by the prosecution, the results of the relevance balancing appear obvious. In these circumstances exclusion was clearly required.[84] Moreover, even if Brown's name is deleted we consider on the facts of this case that evidence of the victim's state of mind, without more, is inadmissible to prove the state of mind of the accused. Accordingly, *no part of the statement should be admitted on a retrial of Brown.*

Turning to the question of whether the error constituted reversible error, we have no difficulty whatever in concluding that it did. In the words of Justice Sullivan of the California Supreme Court in the *Ireland* case:

> The error was prejudicial. The statement in question not only reflected Ann's [victim] state of mind at the time of utterance; it also constituted an opinion on her part as to conduct which defendant would undertake at a future time. On the basis of this hearsay opinion the jury might reasonably have inferred that Ann several hours before the homicide had concluded that defendant had then formed the intention to kill her. *The next logical inference,* to wit, that

Ann's assessment of defendant's then intention was accurate and defendant had in fact formed an intention to kill several hours before the homicide . . . *strikes directly at the heart of the defense. The judgment must, therefore, be reversed.* (emphasis added)

People v. Ireland, 70 Cal.2d 522, 75 Cal.Rptr. 188, 193–194, 450 P.2d 580, 585 (1969). *See also* People v. Hamilton, note 21 *supra,* 362 P.2d at 484; People v. Lew, note 21 *supra,* 441 P.2d at 945–946; State v. Bartolon, note 24 *supra,* 495 P.2d at 776; People v. Purvis, note 24 *supra,* 362 P.2d at 716–717.

The statement presented all the classic hearsay dangers and abuses. Here was that voice from the grave casting an incriminating shadow on the defendant. On what grounds did the victim base his fear of appellant? Was the fear a rational one? Even if justified in fearing someone, was appellant the proper focus of that fear? These questions cry out to be voiced as part of defense counsel's cross-examination. Yet there is no one to cross-examine or confront. The damaging evidence stands impregnable—irretrievably lodged in the jurors' minds. We find that the erroneously admitted evidence here is equally as crucial as that in *Ireland, supra*—that it "strikes at the heart of the defense."

The defendant contended that he was not the person who killed Parks. The point at issue was thus the identity of Parks' killer. The Government's evidence at its fullest put three men,

---

That type of argument and that type of testimony is really the only way that the jury can evaluate his presence on the scene, and because of the fact that this is the only way that this kind of testimony can get in, since he is dead and cannot say: I wouldn't have gone there in a million years; the man I was hiding from was this man.

This is the only way that that kind of thing can get before the jury and the only way that the jury can know it.

We feel that it is a most relevant fact. Unless the jury gets that fact the Government's case is being presented with a hole, with a piece missing.

Tr. 327–28.

84. "When the declarations are of such a nature as to be obviously prejudicial, and where any possible proper benefit to the prosecution is far outweighed by its prejudicial effect to the accused, such evidence should be excluded." People v. Hamilton, note 21 *supra,* 13 Cal.Rptr. at 656, 362 P.2d at 480.

Brown, Austin and Ferguson,[85] on the second floor of the building, with at least two with guns,[86] at or about the moment Parks was killed.[87] In such factual setting, the admission of the hearsay statement that Parks feared he would be killed by Brown is grossly prejudicial to Brown. The judgment of conviction of the lesser offense included within count one of the indictment is accordingly reversed and a new trial is ordered on the charge of second degree murder.[88]

## VI. THE CONVICTION OF CARRYING A DANGEROUS WEAPON

■ However, we are of opinion that the erroneous admission of the state of mind testimony did not in any way improperly influence the verdict with respect to the charge of carrying a dangerous weapon, a pistol, in violation of D.C.Code § 22–3204.[89] When the evidence adduced with respect to this offense is fairly appraised it must be concluded that appellant's alibi claim was proved beyond a reasonable doubt to have been a fabrication. This conclusion flows from the letter in his own handwriting[90] to his girl friend, Nadine Frazier,[91] by his statements to her suggesting the fabrication of an alibi,[92] by his admission to Nadine Frazier that he was present when Parks was killed,[93] and by the testimony of one Baylor, who had no prior personal involvement with appellant, that at about the time of the killing he saw him walk away from the house where Parks was killed.[94]

The elements of the substantive offense were also proved by strong evidence. Eyewitness testimony permitted the jury to conclude that appellant was seen carrying a .45 caliber automatic within moments following the killing.[95] Under the circumstances testified as existing at that time, where the victim's body had just rolled down the stairs and into view of those on the first floor, closely following by appellant carrying the gun, it was also permissible for the jury to conclude that his purpose in carrying the weapon at that time was to use it as a weapon if necessary.[96] In fact, any other conclusion would belie the evidence. Thus, the jury's verdict on this count is wholly supported by substantial testimony, exclusive of the erroneously admitted state of mind testimony. The state of mind testimony was circumstantial and went to the murder charge, whereas the charge of carrying a dangerous weapon was supported completely by direct testimony uninfluenced by the state of mind testimony. Under

85. Brown, Austin (Beaver) and Ferguson (Tr. 166–176).

86. Brown, a .45 caliber automatic (Tr. 175–176). Austin, a .25 caliber automatic (Tr. 168).

87. Note 81 *supra.*

88. *Cf.* Price v. Georgia, 398 U.S. 323, 90 S. Ct. 1757, 26 L.Ed.2d 300 (1970) ; Green v. United States, 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957).

89. The statute provides :
 No person shall within the District of Columbia carry either openly or concealed on or about his person, except in his dwelling house or place of business or on other land possessed by him, a pistol, without a license therefor as hereinafter provided, or any deadly or dangerous weapon capable of being so concealed.
 . . . .
 D.C.Code § 22–3204 (1973).
 The indictment charged :

THIRD COUNT:
 On or about October 4, 1968, within the District of Columbia, Roland W. Brown did carry, openly and concealed on or about his person, a dangerous weapon, capable of being so concealed, that is, a pistol, without a license therefor issued as provided by law.

90. Govt. Ex. 15.

91. Tr. 371, 378.

92. *Id.* 395, 371, 375.

93. *Id.* 372, 375.

94. *Id.* 233–235, 239, 254, 263.

95. *Id.* 175–176.

96. Fall v. Esso Standard Oil Company, 297 F.2d 411, 414 (5th Cir. 1961) ; Eagleston v. United States, 172 F.2d 194, 199, 12 Alaska 213 (9th Cir.), cert. denied, 336 U.S. 952, 69 S.Ct. 882, 93 L.Ed. 1107 (1949) ; Tatum v. United States, 71 App.D.C. 393, 110 F.2d 555 (1940) ; Leftwitch v. United States, 251 A.2d 646 (D.C.App.1969).

such circumstances appellant's conviction on the second count was not prejudiced by the court's error. We accordingly affirm the conviction and sentence for carrying a dangerous weapon.

Judgment accordingly.