Argued May 20, affirmed as modified October 4, petition for rehearing denied November 9, 1971, petition for review denied January 11, 1972

## STATE OF OREGON, *Respondent, v.* ROGER ALLEN SHIRLEY, *Appellant.*

488 P2d 1401

*Oscar D. Howlett,* Portland, argued the cause and filed the brief for appellant.

*Walter L. Barrie,* Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and Jacob B. Tanzer, Solicitor General, Salem.

Before SCHWAB, Chief Judge, and FORT and THORNTON, Judges.

FORT, J.

Defendant and one Brown were jointly indicted for first degree murder. Defendant waived trial by jury and was convicted by the court of second degree felony murder. ORS 163.020 (1). He appeals, asserting error in the admission of hearsay evidence and on the further ground that as a matter of law he was not guilty of second degree felony murder.

A summary of the facts is necessary to an understanding of both contentions. The evidence was sufficient to establish that Brown was engaged in the wholesale drug traffic and that Shirley was associated with him therein. The decedent, Bruce Tucker, worked for Brown as a salesman or pusher. Two days before the killing, Brown furnished Tucker with five bags of heroin to sell for him and loaned Tucker his Cadillac car for that purpose. Tucker departed with the heroin and the car.

Tucker did not thereafter report back to Brown. He did not return his car nor account for the heroin or its proceeds. When he did not, Brown became angry. There was evidence that Tucker had in fact wrecked the car. Shirley told Brown that Tucker could not be permitted to "rip him off" like that and that Brown should go and show people he was not going to let that happen any more. The two defendants determined to find Tucker. Brown had with him at that time a gun

which earlier that week he had bought from the decedent Tucker. Brown stated that if he ever saw Tucker again he would kill him.

One Martell and Tucker were business associates in the business of selling narcotics. Tucker, on the evening prior to the shooting, had gone to Martell's apartment. Martell found him there hiding in a closet holding a gun. Martell testified Tucker was "Nervous. Upset." Over appropriate objection the following testimony was received:

"Q. Did he tell you why?
"A. Concerned.
"* * * * *

"Q. Did he tell you why he was nervous?
"A. Yes. He said that about two days previous to this he had left Rochester's[1] house with Rochester's car and about five bags of heroin or so. And during this two days time he had lost the heroin and somehow Rochester's car had gotten wrecked or somehow, so it wasn't running, you know, and he had taken a cab over to my apartment when he could not get Rochester's car going.
"* * * * *

"A. So when he couldn't get Rochester's car going he took a cab and came over to my apartment which was about—he came over about 10:00 o'clock or so on the night of the 26th.

"Q. He stayed there that night?
"A. Yes, he did. He asked if he could stay at my apartment and I—that I would, you know, refrain from bringing anybody up there or letting anybody know where he was at, up at my apartment or not, and whether or not he could sleep on my

---

[1] Rochester was the nickname of defendant Brown. He was so generally referred to throughout the testimony.

couch until he got this situation straightened around.

"* * * * *"

The first assignment of error relates to receipt of the foregoing and to similar testimony from another witness who was also at the Martell appartment at the time Tucker made the foregoing remarks.

Tucker remained with Martell at the latter's apartment that night. The next morning the defendants learned where Tucker was and drove there in Shirley's car. Tucker observed their arrival from a window and exclaimed, "* * * 'Oh my God, Rochester① is here.' * * *." He then immediately hid himself in a closet. Martell voluntarily admitted Brown and Shirley, who both searched the apartment. Brown found Tucker hiding in the closet. He dragged Tucker by the scruff of his neck into the living room and pushed him into a chair. Martell and Shirley sat down on the couch. Shirley produced a pocket knife and held it unopened but in plain view on his knee. Brown then, while standing up, questioned and berated Tucker concerning the heroin and the car. Brown had the small pistol cupped in the palm of his hand. As Tucker, while trying to explain, began to rise from the chair, Brown struck him across the head with the pistol, knocking Tucker down again into the chair. Brown continued screaming epithets and accusations at Tucker. The latter again began to get up from the chair, and Brown once again struck Tucker hard alongside the head still with the gun in his hand. The pistol went off. At first no one was aware Tucker had been hit. When his breathing shortly changed marked-

---

① Rochester was the nickname of defendant Brown. He was so generally referred to throughout the testimony.

ly, Brown turned to Shirley and said, "O.K., let's go." They did so. Tucker died shortly thereafter.

The court found beyond a reasonable doubt that the defendant "aided and abetted Brown in the commission of second degree felony murder." The second assignment challenges the finding. We will consider the evidence question first.

■ It is agreed that the challenged testimony constitutes hearsay. The state contends, however, that it is admissible here as a statement of mental condition.

In *State v. Fong,* 211 Or 1, 314 P2d 243 (1957), the court considered the admissibility of a statement by the victim of a homicide made to her friends in the absence of defendant. The court said:

> "* * * The evidence of Diane's statements to her friends about the narcotic dealings of the defendant and Wayne Fong was objected to as hearsay and its admission is assigned as error, but the ruling was correct under an exception to the hearsay rule, not to prove that the defendant and her husband dealt in narcotics, but to show the state of mind of the deceased and her knowledge of these alleged illegal activities. [Citing cases.]" 211 Or at 21-22.

In *State v. Farnam,* 82 Or 211, 161 P 417 (1916), the court considered the admissibility of a statement made by a victim of a homicide to friends the day before in the absence of the defendant.

The court, after an exhaustive analysis of the law, said:

> "The declaration of Edna Morgan was made in a perfectly natural manner, and there is nowhere in the record any intimation that it was made otherwise. The whereabouts of Edna Morgan was a ma-

terial issue. It was important to know what she did and where she went. The state contended that she met the defendant and accompanied him to the Beamer barn. Evidence of her declaration was competent to show what was in her mind, and that what she intended to do was probably done: *State v. Mortensen,* 26 Utah, 312 (73 Pac. 562, 563). * * *" 82 Or at 251.

*See also, Marr v. Putnam,* 213 Or 17, 321 P2d 1061 (1958); *State v. Butler,* 96 Or 219, 228-30, 186 P 55 (1920); *State v. Planck,* 3 Or App 331, 473 P2d 694, Sup Ct *review denied* (1970), *cert denied* 406 US 973 (1972); *People v. Hamilton,* 55 Cal 2d 881, 13 Cal Rptr 649, 362 P2d 473 (1961); *Lowrey v. State,* 87 Okla Cr 313, 197 P2d 637 (1948); *State v. Bauers,* 25 Wash 2d 825, 172 P2d 279 (1946); McCormick, Evidence 567-576, §§ 268-270 (1954); 6 Wigmore, Evidence 79, 98, §§ 1725, 1731 (3d ed 1940).

Here too the deceased's declaration was made in a manner "perfectly natural" under the circumstances then existing. The state had a right to show the state of mind of the victim at the time of and shortly prior to the homicide and for that purpose to show what circumstances as expressed by the victim contributed thereto. The objection was correctly overruled.

■ We turn to the contention that as a matter of law defendant Shirley was not guilty of second degree felony murder. ORS 163.020 (1). Specifically, the court found that the "defendant aided and abetted Brown in the commission of second degree felony murder."

The defendant relies on *State v. Branch,* 244 Or 97, 415 P2d 766 (1966). He contends that here the

assault by Brown while armed with a dangerous weapon was not a collateral felony under the rule in *Branch,* and therefore, in the words of *Branch,* it "merged with the killing and could not be relied upon by the state as an ingredient of a 'felony murder.' * * *."

*Branch* arose out of the following facts, which we quote from the court's opinion:

> "The evidence established that Branch shot and killed Tommy Poole with a pistol as Poole was getting out of an automobile which was double-parked alongside Branch's automobile. Several days before the killing there had been an altercation between the same parties and Poole had inflicted a beating upon Branch. A defense of self-defense was relied upon. * * *" 244 Or at 98-99.

In that context the court concluded that the shooting was not separable from the assault and that the latter did indeed merge with the killing.

Here the trial court not only convicted the defendant of second degree felony murder but, in addition, said:

> "* * * [T]he evidence here clearly shows that the assault with great force or assault with force likely to inflict great bodily harm was underway and the evidence was quite clear, I think, that the pistol was so held as to be likely to inflict great bodily harm and that the discharge of the bullet in the pistol was, in effect, accidental. * * *"

No other finding concerning the commission of a collateral felony by the defendant embraced within ORS 163.020 (1), such as the sale or possession of heroin (ORS 475.100), was made by the trial court. Since the trial judge here was, in the absence of a jury, the trier of fact, we cannot assume that a judgment included findings not made or reasonably inferable

therefrom. Furthermore the state contended only that the killing took place during the commission of a burglary. The trial court, correctly we think, rejected this theory and found expressly that defendant and Brown were not engaged in the commission of a burglary.

The trial court, after making the remarks above set forth, then said:

"* * * But it seems to me that State versus Branch would not prevent a finding of second degree felony murder.

"Third, even if I am in error in that comment or suggestion, there isn't any question but that the crime which Brown was committing was at least manslaughter. * * *"

In *Branch* the Supreme Court said:

"The state contends that the felony need not be a collateral one, but that any included felony, such as an aggravated assault, is a sufficient felony to entitle the state to an instruction on felony murder under ORS 163.020. We disagree.

"In order to preserve the distinctions between the degrees of murder and manslaughter, courts in other states have held that where the only felony committed (apart from the murder itself) was the assault upon the victim which resulted in the death of the victim, the assault merged with the killing and could not be relied upon by the state as an ingredient of a 'felony murder.' * * *." 244 Or at 100.

In so holding the court relied on a number of authorities. One of these was *People v. Lazar*, 271 NY 27, 2 NE2d 32 (1936). There the defendant was indicted for first degree murder. The facts bore a striking similarity to those here, indicating:

"* * * [T]hat in an attempt to compel the deceased to pay a claim, he assaulted the deceased

by striking him on the head with the butt of a revolver. The deceased seized a shovel with which to defend himself and in the affray the appellant shot the deceased without premeditation or deliberation; that he did not intend to shoot deceased when he assaulted him." 271 NY at 28.

The court instructed the jury in part on the theory that if they found the killing took place in the commission of the felony of "assault in the second degree upon the deceased 'even though without premeditation, without deliberation, without the intent to effect death,' " it would constitute murder. This was held to be reversible error. The court said:

"In the case of *People v. Huter*, (*supra*, p. 244) it was said: 'In order, therefore, to constitute murder in the first degree by the unintentional killing of another while engaged in the commission of a felony, we think that while the violence may constitute a part of the homicide, yet the other elements constituting the felony in which he is engaged must be so distinct from that of the homicide as not to be an ingredient of the homicide, indictable therewith or convictable thereunder.' " 271 NY at 30.

Limited as we are by the above specific findings of the trial court here, we are unable to distinguish this case from the rule of *State v. Branch*, supra, as above set forth. Accordingly, we hold that the assault merged with the killing. The finding of second degree murder based upon the assault was error.

Here, however, the trial court did expressly find Brown guilty of manslaughter, and the defendant of aiding and abetting him therein. The defendant does not contend that there is not ample evidence to support both findings.

In *Branch* the court said:

"The more difficult problem in the case at bar is whether the error requires reversal. * * *

"Manslaughter is punishable by a term of imprisonment of not more than 15 years. The defendant was sentenced to a term not to exceed five years. We have no way of knowing whether the defendant would have received a more favorable sentence if the jury had found him guilty of manslaughter. While ordinarily it is necessary to remand a case of this kind for another trial when an error is shown to have been made in instructing the jury, this is a proper case in which to apply Oregon Constitution, Art VII, § 3 in modification of the judgment. See *State v. Braley,* 224 Or 1, 355 P2d 467 (1960). Accordingly, we vacate the sentence and remand the cause for resentencing for the crime of manslaughter * * *." 244 Or at 101.

Here the court imposed a sentence of 25 years. It follows that the judgment must be set aside and the cause remanded for resentencing for the crime of manslaughter.

Affirmed as modified.