Argued and submitted May 17, 1982, reversed and remanded for new trial March 7, reconsideration denied April 20, petition for review denied May 15, 1984 (297 Or 124)

# STATE OF OREGON,
*Respondent,*

*v.*

# ROBERT EARL WOOD,
*Appellant.*

(10-79-10819 and 10-79-10820; CA A20215 & A20216)
(Cases Consolidated)

678 P2d 1238

Donald D. Diment, Jr., Eugene, argued the cause for appellant. With him on the briefs were Jack A. Billings, and Diment & Billings, Eugene.

F. Douglas Harcleroad, Assistant District Attorney, Eugene, argued the cause for respondent. With him on the brief were J. Pat Horton, District Attorney, and Joseph M. Kosydar, Assistant District Attorney, Eugene.

Before Gillette, Presiding Judge, and Warden and Young, Judges.

WARDEN, J.

## WARDEN, J.

Defendant appeals his convictions after trial to the court for first-degree official misconduct and first-degree perjury. He assigns seven errors. The first two concern challenges to the grand jury indictments. Assignments three, four and five concern nondisclosure of grand jury transcripts. Assignment six concerns admissibility of testimony of a witness about one end of a telephone conversation. In assignment seven, defendant challenges the materiality of his allegedly perjured testimony. We reverse on the issue of nondisclosure of grand jury transcripts and remand for a new trial. We discuss the other assignments only because the issues may arise on retrial.

In 1978, Al Phelps owned the Willamette Christian Center property (WCC property) adjacent to the Lane County Fairgrounds. Lane County wanted to acquire the property. In March or April, Phelps approached the county. The then Lane County Commissioners, defendant, Gerald Rust and Archie Weinstein, expressed interest. Darrell Adkison, County Property supervisor, suggested trading surplus property. Defendant was authorized to negotiate for the county. Lane County appraised the WCC property at $961,000 and selected two parcels of surplus county land, appraised by Thomas Morgan of the county Real Estate Division, for trade. The parcels were known as the County Farm property, valued at $596,160, and the 30th Avenue property, valued at $365,700. It is the 30th Avenue property that is at the heart of this dispute. In June, 1978, Lane County made a formal offer to Phelps to exchange properties.

Also in June, Phelps tried to sell the 30th Avenue property. He met with his broker, Leona Smith, Robert Wang, the eventual buyer, and Wang's broker, Mark Beeman. By month's end Wang had agreed to purchase the 30th Avenue property from Phelps for $800,000. At trial Smith testified that she was pressured by Beeman and Wang to produce some documentation that Phelps possessed a saleable interest in the 30th Avenue property. In response Phelps placed a telephone call, purportedly to defendant, during which Phelps told defendant that he had a buyer offering $800,000 for the property and needed documentation of his interest.

The county's offer to Phelps was mailed in early July, and Phelps' attorney accepted the offer. It was also in July that Michael Safley, a local real estate broker, became involved. He found a purchaser for the County Farm property and eventually became Phelps' partner. Safley had contributed to defendant's political campaigns and had had numerous contacts with defendant while the county's deal with Phelps was pending; in January, 1979, at the end of his term as County Commissioner, defendant went to work for Safley.

In late August the Lane County Board and Phelps executed the property exchange agreements. On August 15, the county transferred the 30th Avenue property to Phelps, who then transferred the WCC property to the county. On August 23, the county transferred the County Farm property to Phelps.

Between August 11 and August 15, Beeman received a preliminary title report, dated August 11, 1978, that showed that the 30th Avenue property was actually two parcels separated by a strip that the county would retain, rather than one continuous parcel as originally believed. Wang was dissatisfied, because the strip created difficulty with future access. That led to the issuance of a county facility permit to provide access to the property. Defendant was present when the permit was issued.

Still dissatisfied with the status of access, Wang and Laird, Wang's attorney, and Beeman met with defendant at his office on August 17, 1978. They discussed the county's future plans for developing an interchange that would provide access to the property. Other ways of access were also discussed. Defendant stated positively that access would be available to the property by way of future construction of an overpass exchange. Defendant made a telephone call to a county employe to inquire about dedication of a portion of the county property to provide access to the 30th Avenue property, should Wang purchase it from Phelps. At trial Beeman testified that defendant was informed at that meeting that the purchase price was $800,000. Wang then closed the transaction for the purchase of the 30th Avenue property late in the afternoon of August 17 by paying the balance of the $800,000.

The mention of the $800,000 purchase price for the property at the August 17 meeting in defendant's office was

corroborated by Wang and his attorney. Evidence of defendant's knowledge of it came from several other sources. There was also evidence that he had also received the information on August 11, 1978. Areta Schultz, defendant's aide, testified that she was present at a luncheon on that date, when defendant commented on the $800,000 purchase price. Defendant and others present at that conversation denied that there was any mention of the price.

A grand jury investigated to determine what, if any, wrongdoing might have occurred during the transaction. Before the grand jury and at trial, defendant denied knowing of the $800,000 purchase price before August 17, 1978. He also denied portions of the conversations related by witnesses to his August 17 meeting with Wang, Wang's attorney and Beeman.

Throughout the course of the transactions, defendant made no disclosures to the other Commissioners of any relationship or knowledge that he may have had regarding the Phelps/Safley-Wang transaction. The other two Commissioners testified that, had they known of some or all of the facts, they might have changed their position regarding the property exchange.

Defendant interposed successive demurrers to the indictment charging official misconduct on grounds that the indictment fails to state facts sufficient to constitute an offense, ORS 135.630(4), that it is not definite and certain, ORS 135.630(6), and that the statute is vague. After being sentenced, he moved for arrest of judgment on the ground that the facts alleged in the indictment do not constitute an offense. ORS 136.500. He assigns error to the denial of both demurrers and the motion.

ORS 162.415(1)(a) provides:

"A public servant commits the crime of official misconduct in the first degree if with intent to obtain a benefit or to harm another:

"He knowingly fails to perform a duty imposed upon him by law or one clearly inherent in the nature of his office * * *."

The indictment charged the crime of official misconduct in the first degree:

"The defendant on or between the 25th day of April, 1978, and the 31st day of December, 1978, in the County aforesaid, being a Lane County Commissioner, a public servant, and with intent to obtain a benefit, did unlawfully and knowingly fail to perform duties imposed upon him by Oregon Revised Statutes 244.040(1) (2) (3), a statute relating to his office, other duties imposed by law and ones clearly inherent in the nature of his office, including the duty of good faith, the duty of honesty, the duty of loyalty to the public and his employer, Lane County, by knowingly failing to disclose information to other members of the Board of Lane County Commissioners which could have affected a certain property transaction engaged in by Lane County, Oregon, Al Phelps, Michael Safley, and others; contrary to statute and against the peace and dignity of the State of Oregon."

In general, an indictment in the language of a statute is sufficient. *State v. Nussbaum,* 261 Or 87, 491 P2d 1013 (1972); *State v. Hatley,* 48 Or App 541, 617 P2d 902, *rev den* 290 Or 171 (1980). This indictment was more specific than the law requires and provided sufficient notice, particularly where, as here, the defendant was provided substantial discovery, *see State v. Keys,* 25 Or App 15, 21-22, 548 P2d 205, *rev den* (1976), and the trial court required the state to file a statement listing the information defendant allegedly failed to disclose and the ways the failure to disclose information would or could have affected the property exchange.

Defendant challenges ORS 162.415(1)(a), under which he was charged, on the ground of vagueness. Defendant contends that it is vague because it provides inadequate notice and contains inadequate standards for enforcement or for adjudication. We disagree.

The Delaware Superior Court has considered a similar challenge to a statute substantively identical to ORS 162.415(1)(a). The Delaware statute provided in pertinent part:

"A public servant is guilty of official misconduct when, intending to obtain a personal benefit or to cause harm to another person:

"* * * * *

"(2) He knowingly refrains from performing a duty which is imposed upon him by law or is clearly inherent in the nature of his office * * *." Del Code tit 11, § 1211(2).

The Delaware court analyzed the statute for vagueness and, emphasizing the statutory requirement of a *knowing* violation of duty, found it sufficient to withstand the challenge. *State v. Green,* 376 A2d 424 (Del Supr Ct 1977); *see Howell v. State,* 421 A2d 892 (Del 1980). The Delaware court's conclusion is consistent with the Commentary to the Proposed Oregon Criminal Code § 215 (enacted as ORS 162.415).[1] We conclude that the statute is not

> "so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application * * *." *Connally v. General Construction Co.,* 269 US 385, 391, 46 S Ct 126, 70 L Ed 322 (1926).

■　　Before trial defendant requested disclosure of transcripts of testimony of witnesses before the grand jury. The motion was denied, although the court ordered the state to disclose any exculpatory information in those transcripts and further required that the transcripts and notes be sealed and

---

[1] The Commentary provides in part:

"Section 214 states the basic offense of official misconduct. Section 215 raises the offense to first degree official misconduct if the public servant is motivated by obtaining a benefit * * * or causing injury to another. Second degree official misconduct does not require this specific intent, but does require a knowing violation of a statute relating to the actor's office. The term 'benefit' is defined in § 182 * * *. 'Public servant' is defined in § 178 * * *.

"* * * * *

"C.　Relationship to Existing Law

"Misconduct in office is defined as 'corrupt behavior by an officer in the exercise of the duties of his office or while acting under color of his office.' Perkins, *Criminal Law* 485 (2d ed 1969). The *mens rea* element in §§ 214 and 215 recognizes that inadequate performance of official duties should ordinarily be regulated by civil remedies. Criminal liability is justified only when the public servant acts with either an intent to [obtain a] benefit * * * or to harm another, or with knowledge that the act violates an applicable statute. Both sections require a 'knowing' violation of duty. Coverage is not intended for ordinary neglect or negligent performance of duty. The negligent performance of an official function does not imply an intent to violate a known duty. This type of misconduct is best regulated by civil service procedures and election alternatives.

"Section 215 (1)(a), the 'omission to act' offense, refers to a failure to perform an official nondiscretionary duty. It requires knowledge of that nondiscretionary duty, which must be one that is imposed by law, or one that is clearly inherent in the nature of the office. A significant aspect is its specific *mens rea* requirement not presently found in existing Oregon statutes relating to official misconduct. The culpability requirements in those statutes are vague and uncertain in that, for the most part, they are controlled by the nebulous term 'wilfully.'　.

"* * * * *" Commentary to Proposed Oregon Criminal Code, 109-10 (1970).

filed with the court. That denial and order were proper under ORS 135.855(1)(c), which excludes grand jury transcripts from pretrial discovery. *See State v. Hartfield,* 290 Or 583, 588-89, 624 P2d 588 (1981) (decided after trial in this case); *State ex rel Johnson v. Roth,* 276 Or 883, 886-87, 557 P2d 230 (1976).

■ At trial, defendant requested at various times, including after each witness had testified, disclosure of transcripts of the grand jury testimony of Morgan, Adkison, Beeman, Wang, Laird and Smith. He assigns error to denial of all but the transcript of Smith's testimony, although he argues in his brief for disclosure of that, too. The trial court did not formally deny defendant's requests. Instead it "disregarded" them, so that it would not become confused between grand jury and trial testimony in this complex, three-week trial to the court. It left to the state the responsibility of determining the existence of exculpatory information and disclosing it, and it ordered the transcripts sealed and made part of the record for appeal. The trial court's refusal to review or to order disclosure of the grand jury transcripts, together with its order to seal them and make them part of the record, effectively denied defendant's requests for disclosure, and the denial is properly before us for review. We hold that the denial was prejudicial error and, therefore, reverse.[2]

It is now the rule in Oregon that

"after a witness has testified on direct examination by the state, the defendant is entitled to examine an existing tape recording of that witness's testimony given in grand jury proceedings that lead to the return of the indictment upon which trial is held.

"* * * Where a witness before the grand jury has testified at trial for the state, a particularized need for disclosure exists

---

[2] The state argues that, if we conclude that the denial was error, the appropriate remedy would be to remand to the trial court to review the transcripts *in camera* to determine if they contain either material inconsistencies with trial testimony or exculpatory information, citing *State v. George,* 56 Or App 1, 640 P2d 1043 (1982), and *State v. Addicks,* 28 Or App 663, 560 P2d 1095 (1977). In those cases, we could not tell from the record whether the discovery statutes had been complied with, and we sent them back to allow the trial court to make that determination. Here, we know that they were not. Also, in this case, although the trial court has not, we have reviewed the transcripts in question. If we remanded and the trial court found no violation and therefore refused disclosure, we would have to repeat on appeal the review we have already made. That review convinces us that the error requires reversal.

for purposes of testing the witness's credibility. * * * As such, the furtherance of justice requires disclosure of prior recorded statements." *State v. Hartfield, supra,* 290 Or at 592.

*Hartfield* was decided several months after defendant's trial. The state urges that the rule not be applied retroactively. If it were, the trial court's denial of disclosure certainly constituted error under it.[3] But we need not decide that issue, because even under this court's decision in *Hartfield,* 45 Or App 639, 609 P2d 390 (1980), which was published over five months before the start of the trial of this case, the court erred. In our *Hartfield* opinion we noted:

> "* * * Disclosure [of testimony before the grand jury] may be had in discrete and limited manner in certain instances, one of which is 'when the testimony of a witness at a criminal trial may be inconsistent with his testimony before a grand jury.' *State ex rel Johnson v. Roth*[, 276 Or] at 886; ORS 132.220(1).
>
> "* * * * *
>
> "The Court in *State ex rel Johnson v. Roth,* 276 Or at 887, n 5, noted that despite [ORS 135.855(1)(c)], however, in certain circumstances disclosure of grand jury testimony may be constitutionally compelled. * * * *Brady v. Maryland,* 373 US 83, 83 S Ct 1194, 10 L Ed 2d 215 (1963) * * *." 45 Or App at 647.

We found *Brady* inapposite, because the defendant had not claimed or shown that the grand jury testimony would be clearly favorable to him or clearly material to establish his guilt or innocence. Defendant here makes that claim. Further, defendant made several showings, to the extent possible, "to support at least a belief and contention in good faith that the evidence demanded is 'favorable' * * * and 'material,' " *State v. Koennecke,* 274 Or 169, 179, 545 P2d 127 (1976), by pointing out discrepancies between the trial testimony of witnesses, their pretrial statements and their testimony before the grand jury, as recalled by one of the grand jurors. The trial court refused defendant's request that it inspect the transcripts of the testimony before the grand jury, relying instead on the state to either to disclose exculpatory information or to face

---

[3] We see no distinction between tape recordings and transcripts of those recordings.

the consequences. Having failed to do the former, the state now must do the latter.[4]

We have reviewed the trial and grand jury testimony of the five witnesses named in the assignments of error. The state argued at trial that the testimony was consistent and not exculpatory, and the state therefore refused to disclose the grand jury transcripts. Our review discloses several material areas in which the grand jury testimony is directly favorable to defendant, substantially impeaches the credibility of state witnesses or indicates their bias. Two examples are sufficient for us to find not only error but prejudicial error. They relate to whether defendant knew beforehand that Phelps would resell the 30th Avenue property to Wang for $800,000. There was testimony at trial that defendant had that knowledge before the exchange was completed from at least one of the following events:

1)  June 30, 1978, when Smith overheard Phelps make a telephone call, allegedly to defendant, in which Phelps named Wang and the $800,000 price;

2)  August 11, 1978, when Adkison told defendant of a rumor that the property would be resold for $800,000;

3)  August 11, 1978, when Schultz was present at a luncheon with defendant and others and heard defendant mention the $800,000 price; and

4)  August 17, 1978, when Beeman, Wang, and Laird met with defendant and Laird mentioned to defendant the $800,000 price in reference to Wang and the 30th Avenue property.

Adkison testified at trial that he had told defendant on August 11, 1978, that he had heard a rumor that the property was going for $800,000. Before the grand jury, in August, 1979, however, Adkison first denied mentioning to defendant a specific price; he then testified that he did not "specifically go in and mention [the rumor] to [the Commissioners]." Two months later, and after reviewing a file memorandum he had written shortly after he had heard the rumor,

---

[4] The consequence is shared by the trial court. Where, as here, a difference of opinion exists as to whether the evidence is favorable and the evidence remains available, the dispute should be resolved by the trial court after an *in camera* inspection. *State ex rel Dooley v. Connall,* 257 Or 94, 102-03, 475 P2d 582 (1970); *State v. Michener,* 25 Or App 523, 530, 550 P2d 449, *rev den* (1976).

he testified before the grand jury that, because the price was noted in the memorandum, he probably, or must have, told defendant of the rumored price, because he would have told defendant what was in the memorandum. At trial, a year later, Adkison was unequivocal in testifying that he had told defendant of the rumor. The change in his testimony is hardly an immaterial inconsistency. Evidence of Adkison's testimony before the grand jury could raise serious doubt as to whether defendant heard of the purchase price from Adkison.

Beeman's testimony differs from grand jury to trial on whether the $800,000 was mentioned at the August 17, 1978, meeting. Beeman's pretrial statement, which was disclosed, does not indicate whether the price was mentioned. When asked before the grand jury, "Did you ever tell Wood of the size of the investment?", Beeman testified:

"A. No, we did not. Or I didn't.

"Q. Did [Wang]?

"A. [Wang] had a propensity to talk about the amount of money involved in that. I don't directly remember [Wang] relaying that. * * *

"* * * * *

"A. That's something [Wang's] going to have to — to give you more of an answer on than I can."

Yet at trial a year later, Beeman remembered that Laird had mentioned the specific figure of $800,000. He also remembered his reaction to the comment as a feeling that it was not something to be discussed with a public official. That, too, is not an immaterial inconsistency. Although both Wang and Laird corroborated Beeman's trial testimony,[5] both were impeached, to some degree, for bias. Because defendant could not use Beeman's grand jury testimony to impeach him, the trial court could have accepted Beeman's testimony as corroboration of Wang's and Laird's, which might otherwise have been insufficient. The lack of disclosure was not mitigated by corroboration from Wang and Laird.

The trial court erred in failing to require the state to disclose testimony before the grand jury as to those two of the four material events.

---

[5] Wang and Laird testified before the Grand Jury *after* Beeman. Their trial testimony did not differ materially from their grand jury testimony.

Evidence as to the other two events raises questions for the factfinder. Schultz's testimony as to the August 11 luncheon was denied by the other three who were present, and Schultz was impeached for bias. The court may well have disregarded her testimony. Evidence of Phelps' telephone call was circumstantial. The trial court could have disregarded it in favor of the more direct evidence of Adkison or Beeman. The date of defendant's knowledge was material. Because the court needed to find only that one event gave defendant that knowledge, and because it made no findings from which we could conclude that it relied on evidence of one of the two events not affected by the nondisclosure, we cannot say that the error did not affect the trial court's decision.

In his sixth assignment, defendant contends that the court erred in admitting Smith's testimony concerning Phelps' telephone call of June 30, 1978, allegedly to defendant.[6] Defendant contends that Smith's testimony was inadmissible hearsay. The state argues that the testimony was admissible in part as evidence of Phelps' state of mind and otherwise as non-hearsay offered only to show notice to defendant and not to prove the truth of the matters asserted in the conversation.

Smith testified that she had met with Phelps at his home on June 30, 1978, at which time she told him that Wang wanted written assurance that Phelps was able legally to sell the 30th Avenue property. The exchange agreement had not yet been signed. She testified that Phelps responded that he would not let $800,000 go out the door, that he would get something in writing and that he would call defendant immediately. She testified that she observed Phelps go to the telephone, dial, ask for defendant and identify himself and that she then heard Phelps refer to Wang, $800,000, and the need for something in writing.

Because we reverse on other grounds, we need not decide whether Smith's testimony relating Phelps' statements to her were admissible hearsay under the state of mind exception as it then existed. *State v. Shirley,* 7 Or App 166, 488 P2d 1401 (1971), *rev den* (1972). On retrial, and assuming that all or part of the testimony regarding Phelps' statement was

---

[6] Phelps died before the trial of this case.

hearsay, the evidence would be admissible under OEC 803(3) as Phelps' statement of his "then existing state of mind * * *, such as intent, plan, motive, design * * *."

■ ■ Defendant last assigns error to the trial court's conclusion that defendant's grand jury testimony was material. ORS 162.055(2) defines "material" as "that which *could* have affected the *course or outcome* of any proceeding or transaction." (Emphasis supplied.) A false statement need not bear on an ultimate fact in dispute to be material. *State v. Ray,* 36 Or App 375, 378-79, 584 P2d 366, *rev den* 284 Or 521 (1978). There was sufficient evidence in the testimony of two grand jurors that defendant's sworn denials to them closed off avenues of inquiry, not only as to defendant's conduct but as to that of others who were subject to grand jury investigation. That was enough under ORS 162.055 to show materiality.

Whether those statements were false, however, must be redetermined. In finding defendant guilty of official misconduct, the trial court necessarily disbelieved defendant's trial testimony, which was consistent with his grand jury testimony. If on retrial the court should have a reasonable doubt on the misconduct charge, the evidence that raises that doubt may well raise doubt as to the knowing falsity of defendant's testimony.

Reversed and remanded for a new trial.